(Slip Opinion)          OCTOBER TERM, 2021          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CITY OF AUSTIN, TEXAS *v.* REAGAN NATIONAL ADVERTISING OF AUSTIN, LLC, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 20–1029.   Argued November 10, 2021—Decided April 21, 2022

Like a great many jurisdictions around the country, the City of Austin, Texas (City), specially regulates signs that advertise things that are not located on the same premises as the sign, as well as signs that direct people to offsite locations. See City Code §25–10–102(1). These are known as off-premises signs. The City's sign code at the time of this dispute prohibited construction of new off-premises signs. *Ibid.* Grandfathered off-premises signs could remain in their existing locations as "nonconforming signs," but could not be altered in ways that increased their nonconformity. §§25–10–3(10), 25–10–152(A)–(B). On-premises signs were not similarly restricted. §25–10–102(6).

Respondents, Reagan National Advertising of Austin, LLC, and Lamar Advantage Outdoor Company, L. P., own billboards in Austin. When Reagan sought permits to digitize some of its billboards, the City denied its applications. Reagan filed suit in state court, alleging that the City's prohibition against digitizing off-premises signs, but not on-premises signs, violated the First Amendment's Free Speech Clause. The City removed the case to federal court, and Lamar intervened. The District Court held that the challenged sign code provisions were content neutral under *Reed* v. *Town of Gilbert*, 576 U. S. 155, reviewed the City's on-/off-premises distinction under intermediate scrutiny, and found that the distinction satisfied that standard. The Court of Appeals reversed. It found the on-/off-premises distinction to be facially content based because a government official had to read a sign's message to determine whether the sign was off-premises. The court then reviewed the City's on-/off-premises distinction under strict scrutiny, and it held that the City failed to satisfy that onerous standard.

*Held*: The City's on-/off-premises distinction is facially content neutral

under the First Amendment.  Pp. 6–14.

  (a) *Reed* held that a regulation of speech is content based under the First Amendment if it "target[s] speech based on its communicative content," *i.e.,* if it "applies to particular speech because of the topic discussed or the idea or message expressed."  576 U. S., at 163.  The Court of Appeals' interpretation of *Reed*—to mean that a regulation cannot be content neutral if its application requires reading the sign at issue—is too extreme an interpretation of this Court's precedent.  Pp. 6–12.

     (1) In *Reed*, the town of Gilbert, Arizona, adopted a comprehensive sign code that applied distinct size, placement, and time restrictions to 23 different categories of signs, giving more favorable treatment to some categories (such as ideological signs or political signs) and less favorable treatment to others (such as temporary directional signs relating to religious events, educational events, or other similar events).  The Court rejected the contention that the restrictions were content neutral because they did not discriminate on the basis of particular viewpoints, reasoning that "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter."  576 U. S., at 169.  Unlike the sign code in *Reed*, the City's sign ordinances here do not single out any topic or subject matter for differential treatment.  A sign's message matters only to the extent that it informs the sign's relative location.  Thus, the City's on-/off-premises distinction is more like ordinary time, place, or manner restrictions, which do not require the application of strict scrutiny.  Cf. *Frisby* v. *Schultz,* 487 U. S. 474, 482.  Pp. 6–8.

     (2) This Court's precedents and doctrines have consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral.  Most relevant here, the First Amendment allows for regulations of solicitation, and speech must be read or heard to determine whether it entails solicitation.  See *Heffron* v. *International Soc. for Krishna Consciousness, Inc.,* 452 U. S. 640.  Moreover, the Court has previously understood distinctions between on-premises and off-premises signs to be content neutral.  See *Suffolk Outdoor Advertising Co.* v. *Hulse*, 439 U. S. 808 (order dismissing appeal); *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789.  Underlying these cases and others is a rejection of the view that *any* examination of speech or expression inherently triggers heightened First Amendment concern.  Rather, content-based regulations are those that discriminate based on "the topic discussed or the idea or message expressed."  *Reed*, 576 U. S., at 171.  Pp. 8–10.

     (3) Reagan's counterargument relies primarily on a sentence in *Reed* recognizing that "[s]ome facial distinctions based on a message

Syllabus

are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." 576 U. S., at 163. Reagan contends that the City's sign code defines off-premises signs on the basis of function or purpose and is therefore content based and subject to strict scrutiny. This stretches *Reed*'s "function or purpose" language too far. *Reed* held that subtler forms of content discrimination cannot escape classification as content based simply because they swap an obvious subject-matter distinction for a function or purpose proxy. That does not mean that any classification that considers function or purpose is *always* content based. Reagan's reading of *Reed* would contravene numerous precedents and cast doubt on the Nation's history of regulating off-premises signs. Pp. 11–12.

   (b) This Court's determination that the City's on-/off-premises distinction is facially content neutral does not end the First Amendment inquiry. Evidence that an impermissible purpose or justification underpins a facially content-neutral restriction may mean that the restriction is nevertheless content based. Moreover, to survive intermediate scrutiny, a restriction on speech or expression must be "'narrowly tailored to serve a significant governmental interest.'" *Ward* v. *Rock Against Racism,* 491 U. S. 781, 791. Because the Court of Appeals did not address these issues, the Court leaves them for remand and expresses no view on the matters. Pp. 13–14.

972 F. 3d 696, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and BREYER, KAGAN, and KAVANAUGH, JJ., joined. BREYER, J., filed a concurring opinion. ALITO, J., filed an opinion concurring in the judgment in part and dissenting in part. THOMAS, J., filed a dissenting opinion, in which GORSUCH and BARRETT, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 20–1029

————

## CITY OF AUSTIN, TEXAS, PETITIONER *v.* REAGAN NATIONAL ADVERTISING OF AUSTIN, LLC, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 21, 2022]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Like thousands of jurisdictions around the country, the City of Austin, Texas (City), regulates signs that advertise things that are not located on the same premises as the sign, as well as signs that direct people to offsite locations. These are known as off-premises signs, and they include, most notably, billboards.  The question presented is whether, under this Court's precedents interpreting the Free Speech Clause of the First Amendment, the City's regulation is subject to strict scrutiny.  We hold that it is not.

I

A

American jurisdictions have regulated outdoor advertisements for well over a century.  See C. Taylor & W. Chang, The History of Outdoor Advertising Regulation in the United States, 15 J. of Macromarketing 47, 48 (Spring 1995).  By some accounts, the proliferation of conspicuous patent-medicine advertisements on rocks and barns prompted States to begin regulating outdoor advertising in the late 1860s. *Ibid.*; F. Presbrey, The History and

Development of Advertising 500–501 (1929). As part of this regulatory tradition, federal, state, and local governments have long distinguished between signs (such as billboards) that promote ideas, products, or services located elsewhere and those that promote or identify things located onsite. For example, this Court in 1932 reviewed and approved of a Utah statute that prohibited signs advertising cigarettes and related products, but allowed businesses selling such products to post onsite signs identifying themselves as dealers. *Packer Corp.* v. *Utah*, 285 U. S. 105, 107, 110.

On-/off-premises distinctions, like the one at issue here, proliferated following the enactment of the Highway Beautification Act of 1965 (Act), 23 U. S. C. §131. In the Act, Congress directed States receiving federal highway funding to regulate outdoor signs in proximity to federal highways, in part by limiting off-premises signs. See §§131(b)–(c) (allowing exceptions for "signs, displays, and devices advertising the sale or lease of property upon which they are located" and "signs, displays, and devices . . . advertising activities conducted on the property on which they are located"). Under the Act, approximately two-thirds of States have implemented similar on-/off-premises distinctions. See App. A to Reply to Brief in Opposition (collecting statutes); Brief for State of Florida et al. as *Amici Curiae* 7, n. 3 (same). The City represents, and respondents have not disputed, that "tens of thousands of municipalities nationwide" have adopted analogous on-/off-premises distinctions in their sign codes. Brief for Petitioner 19; see also App. B to Reply to Brief in Opposition (collecting examples of ordinances); Brief for State of Florida et al. as *Amici Curiae* 8, n. 4 (same).

The City of Austin is one such municipality. The City distinguishes between on-premises and off-premises signs in its sign code, and specially regulates the latter, in order to "protect the aesthetic value of the city and to protect public safety." App. 39.

During the time period relevant to this dispute, the City's sign code defined the term "off-premise sign" to mean "a sign advertising a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that directs persons to any location not on that site." Austin, Tex., City Code §25–10–3(11) (2016). This definition was materially analogous to the one used in the federal Highway Beautification Act and many other state and local codes referenced above. The code prohibited the construction of any new off-premises signs, §25–10–102(1), but allowed existing off-premises signs to remain as grandfathered "non-conforming signs," §25–10–3(10). An owner of a grandfathered off-premises sign could "continue or maintain [it] at its existing location" and could change the "face of the sign," but could not "increase the degree of the existing nonconformity," "change the method or technology used to convey a message," or "increase the illumination of the sign." §§25–10–152(A)–(B). By contrast, the code permitted the digitization of on-premises signs. §25–10–102(6) (permitting "electronically controlled changeable-copy sign[s]").[1]

B

Respondents, Reagan National Advertising of Austin, LLC (Reagan), and Lamar Advantage Outdoor Company, L. P. (Lamar), are outdoor-advertising companies that own billboards in Austin. In April and June of 2017, Reagan sought permits from the City to digitize some of its off-premises billboards. The City denied the applications. Reagan filed suit against the City in state court alleging that the code's prohibition against digitizing off-premises signs, but not on-premises signs, violated the Free Speech Clause of the First Amendment. The City removed the case

——————

[1] The City subsequently amended its sign code. The parties agree that the amendments do not affect this dispute. Reply to Brief in Opposition 11–12; Brief for Respondent Reagan 9.

to federal court, and Lamar intervened as a plaintiff.[2]

After the parties stipulated to the pertinent facts, the District Court held a bench trial and entered judgment in favor of the City. 377 F. Supp. 3d 670, 673, 683 (WD Tex. 2019). As relevant, the court held that the challenged sign code provisions were content neutral under *Reed* v. *Town of Gilbert*, 576 U. S. 155 (2015). The court explained that "the on/off premises distinction [did] not impose greater restrictions for political messages, religious messages, or any other subject matter," and "d[id] not require a viewer to evaluate the topic, idea, or viewpoint on the sign"; instead, it required the viewer only "to determine whether the subject matter is located on the same property as the sign." 377 F. Supp. 3d, at 681. The court therefore held that the distinction was a facially content-neutral "regulation based on location." *Ibid.* The court further found "no evidence in the record" that the City had applied the sign code provisions "differently for different messages or speakers" or that its stated concern for esthetics and safety was "pretext for any other purpose." *Id.,* at 681–682. Accordingly, the court reviewed the City's on-/off-premises distinction under the standard of intermediate scrutiny applicable to content-neutral regulations of speech. *Id.,* at 682. The court found that the distinction satisfied this standard. *Id.,* at 682–683.

The Court of Appeals reversed. 972 F. 3d 696, 699 (CA5 2020). The court opined that because the City's on-/off-premises distinction required a reader to inquire "who is the speaker and what is the speaker saying," "both hallmarks of a content-based inquiry," the distinction was content based. *Id.,* at 706. It reasoned that "[t]he fact that a government official ha[s] to read a sign's message to determine the sign's purpose [i]s enough to" render a regulation content based and "subject [it] to strict scrutiny." *Ibid.*

_____

[2] Lamar did not participate in the proceedings on the merits before this Court. Brief for Respondent Reagan II.

(citing *Thomas* v. *Bright*, 937 F. 3d 721, 730–731 (CA6 2019)); see also 972 F. 3d, at 704 ("To determine whether a sign is on-premises or off-premises, one must read the sign . . . "). The court acknowledged that its interpretation of *Reed* was "broad," but reasoned that the consequences were "not . . . unforeseen," given the concerns raised by Justices who did not join the opinion of the Court. 972 F. 3d, at 707.

Because the Court of Appeals determined that the City's on-/off-premises distinction imposed a content-based restriction on speech, it reviewed that distinction under the onerous standard of strict scrutiny. Recognizing that strict scrutiny "is, understandably, a hard standard to meet" and that it "leads to almost certain legal condemnation," *id.,* at 709, the court held that the City's justifications for the distinction could not meet that standard, rendering it unconstitutional, *id.,* at 709–710.[3]

This Court granted certiorari. 594 U. S. \_\_\_ (2021).

_____

[3] The Court of Appeals further considered the possibility that the code provisions regulated only commercial speech, such that only intermediate scrutiny would apply even if the provisions were content based. 972 F. 3d, at 707–709; see *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 566 (1980). The court rejected this view because the provisions "applie[d] with equal force to both commercial and noncommercial messages." 972 F. 3d, at 709. Before this Court, the City makes a similar argument, claiming that "[a]s applied to billboards like those owned by respondents," the contested code provisions regulate commercial speech and so are subject to intermediate scrutiny. Brief for Petitioner 49. It is undisputed, however, that Reagan's billboards also display noncommercial messages, meaning that the City's denial of Reagan's applications for digitization implicated Reagan's commercial and noncommercial speech alike. See Brief for Respondent Reagan 45–46; App. 130–141. More importantly, as the Court of Appeals explained, the contested code provisions admit of no exception for noncommercial speech. The only way in which they differentiate speech is by distinguishing between on-premises and off-premises signs. The Court thus must determine which level of scrutiny applies to the manner in which the provisions actually regulate speech.

II

A regulation of speech is facially content based under the
First Amendment if it "target[s] speech based on its com-
municative content"—that is, if it "applies to particular
speech because of the topic discussed or the idea or message
expressed." *Reed*, 576 U. S., at 163.  The Court of Appeals
interpreted *Reed* to mean that if "[a] reader must ask: who
is the speaker and what is the speaker saying" to apply a
regulation, then the regulation is automatically content
based.  972 F. 3d, at 706.  This rule, which holds that a reg-
ulation cannot be content neutral if it requires reading the
sign at issue, is too extreme an interpretation of this Court's
precedent.  Unlike the regulations at issue in *Reed*, the
City's off-premises distinction requires an examination of
speech only in service of drawing neutral, location-based
lines.  It is agnostic as to content.  Thus, absent a content-
based purpose or justification, the City's distinction is con-
tent neutral and does not warrant the application of strict
scrutiny.

A

The *Reed* Court confronted a very different regulatory
scheme than the one at issue here: a comprehensive sign
code that "single[d] out specific subject matter for differen-
tial treatment."  576 U. S., at 169.  The town of Gilbert, Ar-
izona, had adopted a code that applied distinct size, place-
ment, and time restrictions to 23 different categories of
signs.  *Id.,* at 159.  The Court focused its analysis on three
categories defined by whether the signs displayed ideologi-
cal, political, or certain temporary directional messages.
The code gave the most favorable treatment to "'Ideological
Sign[s],'" defined as those "'communicating a message or
ideas for noncommercial purposes'" with certain excep-
tions.  *Id.,* at 159–160 (alteration in original).  It offered less
favorable treatment to "'Political Sign[s],'" defined as those
"'designed to influence the outcome of an election.'"  *Id.,* at

160 (alteration in original). Most restricted of all were
"'Temporary Directional Signs Relating to a Qualifying
Event,'" with qualifying events defined as gatherings
"'sponsored, arranged, or promoted by a religious, charita-
ble, community service, educational, or other similar non-
profit organization.'" *Id.,* at 160–161.

The *Reed* Court determined that these restrictions were
facially content based. *Id.,* at 164–165. Rejecting the con-
tention that the restrictions were content neutral because
they did not discriminate on the basis of viewpoint, the
Court explained: "[I]t is well established that '[t]he First
Amendment's hostility to content-based regulation extends
not only to restrictions on particular viewpoints, but also to
prohibition of public discussion of an entire topic.'" *Id.,* at
169 (quoting *Consolidated Edison Co. of N. Y.* v. *Public
Serv. Comm'n of N. Y.*, 447 U. S. 530, 537 (1980)); accord,
*e.g., Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95
(1972) (explaining that "[t]he central problem" with a mu-
nicipality's effort to exempt labor picketing from a prohibi-
tion on picketing near public schools was "that it describes
permissible picketing in terms of its subject matter"); *Carey*
v. *Brown*, 447 U. S. 455, 460–461 (1980) (subjecting a simi-
lar statute that "accord[ed] preferential treatment to the ex-
pression of views on one particular subject" to strict scru-
tiny).[4] Applying these principles, the Court reasoned that
"a speech regulation targeted at specific subject matter is
content based even if it does not discriminate among view-
points within that subject matter. . . . For example, a law

———————
[4] The concurrence in *Reed*, which spoke for three of the six Justices in
the majority, similarly explained that "[c]ontent-based laws merit th[e]
protection" of strict scrutiny "because they present, albeit sometimes in
a subtler form, the same dangers as laws that regulate speech based on
viewpoint. Limiting speech based on its 'topic' or 'subject' favors those
who do not want to disturb the status quo. Such regulations may inter-
fere with democratic self-government and the search for truth." 576
U. S., at 174 (ALITO, J., concurring) (quoting *Consolidated Edison Co. of
N. Y.*, 447 U. S., at 537).

banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." 576 U. S., at 169.  By treating ideological messages more favorably than political messages, and both more favorably than temporary directional messages, "[t]he Town's Sign Code likewise single[d] out specific subject matter for differential treatment, even if it [did] not target viewpoints within that subject matter." *Ibid.*

   In this case, enforcing the City's challenged sign code provisions requires reading a billboard to determine whether it directs readers to the property on which it stands or to some other, offsite location.  Unlike the sign code at issue in *Reed*, however, the City's provisions at issue here do not single out any topic or subject matter for differential treatment.  A sign's substantive message itself is irrelevant to the application of the provisions; there are no content-discriminatory classifications for political messages, ideological messages, or directional messages concerning specific events, including those sponsored by religious and nonprofit organizations.  Rather, the City's provisions distinguish based on location: A given sign is treated differently based solely on whether it is located on the same premises as the thing being discussed or not.  The message on the sign matters only to the extent that it informs the sign's relative location.  The on-/off-premises distinction is therefore similar to ordinary time, place, or manner restrictions. *Reed* does not require the application of strict scrutiny to this kind of location-based regulation.  Cf. *Frisby* v. *Schultz*, 487 U. S. 474, 482 (1988) (sustaining an ordinance that prohibited "only picketing focused on, and taking place in front of, a particular residence" as content neutral).

## B

   This Court's First Amendment precedents and doctrines have consistently recognized that restrictions on speech

may require some evaluation of the speech and nonetheless remain content neutral.

Most relevant here, the First Amendment allows for regulations of solicitation—that is, speech "requesting or seeking to obtain something" or "[a]n attempt or effort to gain business." Black's Law Dictionary 1677 (11th ed. 2019). To identify whether speech entails solicitation, one must read or hear it first. Even so, the Court has reasoned that restrictions on solicitation are not content based and do not inherently present "the potential for becoming a means of suppressing a particular point of view," so long as they do not discriminate based on topic, subject matter, or viewpoint. *Heffron* v. *International Soc. for Krishna Consciousness, Inc.*, 452 U. S. 640, 649 (1981).

Thus, in 1940, the Court invalidated a statute prohibiting solicitation for religious causes but observed that States were "free to regulate the time and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience." *Cantwell* v. *Connecticut*, 310 U. S. 296, 306–307. Decades later, the Court reviewed just such a time, place, and manner regulation restricting all solicitation at the Minnesota State Fair, as well as all sale or distribution of merchandise, to a specific location. *Heffron*, 452 U. S., at 643–644. The State had applied the restriction against a religious practice that included "solicit[ing] donations for the support of the Krishna religion." *Id.,* at 645. As a result, members of the religion were free to roam the fairgrounds and discuss their beliefs, but they were prohibited from asking for donations for their cause outside of a designated location. *Id.,* at 646, 655. The Court upheld the State's application of this restriction as content neutral, emphasizing that it "applie[d] evenhandedly to all who wish[ed] . . . to solicit funds," whether for "commercial or charitable" reasons. *Id.,* at 649.

Consistent with these precedents, the Court has previously understood distinctions between on-premises and off-

premises signs, like the one at issue in this case, to be content neutral. In 1978, the Court summarily dismissed an appeal "for want of a substantial federal question" where a state court had approved of an on-/off-premises distinction as a permissible time, place, and manner restriction under the Free Speech Clause. *Suffolk Outdoor Advertising Co.* v. *Hulse*, 439 U. S. 808 (1978). Three years later, the Court upheld in relevant part an ordinance that prohibited all off-premises commercial advertising but allowed on-premises commercial advertising. *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 503–512 (1981) (plurality opinion).[5] The *Metromedia* Court did not need to decide whether the off-premises prohibition was content based, as it regulated only commercial speech and so was subject to intermediate scrutiny in any event. See *id.,* at 507–512 (citing *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980)). Shortly thereafter, however, the Court applied the relevant portion of *Metromedia* and described the off-premises prohibition as "a *content-neutral* prohibition against the use of billboards." *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 807 (1984) (emphasis added).

Underlying these cases and others is a rejection of the view that *any* examination of speech or expression inherently triggers heightened First Amendment concern. Rather, it is regulations that discriminate based on "the topic discussed or the idea or message expressed" that are content based. *Reed*, 576 U. S., at 171. The sign code provisions challenged here do not discriminate on those bases.

―――――――

[5] Although the opinion in *Metromedia* was labeled a plurality for four Justices, the relevant portion of the opinion was also joined by a fifth. See 453 U. S., at 541 (Stevens, J., dissenting in part) ("join[ing] Parts I through IV of JUSTICE WHITE's opinion").

C

Reagan does not claim *Reed* expressly or implicitly overturned the precedents discussed above. Its argument relies primarily on one sentence in *Reed* recognizing that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.,* at 163. Seizing on this reference, Reagan asserts that the City's sign code "defines off-premises signs based on their 'function or purpose.'" Brief for Respondent Reagan 20 (quoting *Reed*, 576 U. S., at 163). It asks the Court to "reaffirm that, where a regulation 'define[s] regulated speech by its function or purpose,' it is content-based on its face and thus subject to strict scrutiny." Brief for Respondent Reagan 34 (quoting *Reed*, 576 U. S., at 163).

The argument stretches *Reed*'s "function or purpose" language too far. The principle the *Reed* Court articulated is more straightforward. While overt subject-matter discrimination is facially content based (for example, "'Ideological Sign[s],'" defined as those "'communicating a message or ideas for noncommercial purposes'"), so, too, are subtler forms of discrimination that achieve identical results based on function or purpose (for example, "'Political Sign[s],'" defined as those "'designed to influence the outcome of an election'"). *Id.,* at 159, 160, 163–164 (alterations in original). In other words, a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a "function or purpose" proxy that achieves the same result. That does not mean that any classification that considers function or purpose is *always* content based. Such a reading of "function or purpose" would contravene numerous precedents, including many of those discussed above. *Reed* did not purport to cast doubt on these cases.

Nor did *Reed* cast doubt on the Nation's history of regu-
lating off-premises signs.  Off-premises billboards of the
sort that predominate today were not present in the found-
ing era, but as large outdoor advertisements proliferated in
the 1800s, regulation followed.  As early as 1932, the Court
had already approved a location-based differential for ad-
vertising signs.  See *Packer Corp.*, 285 U. S., at 107, 110.
Thereafter, for the last 50-plus years, federal, state, and lo-
cal jurisdictions have repeatedly relied upon on-/off-
premises distinctions to address the distinct safety and es-
thetic challenges posed by billboards and other methods of
outdoor advertising.  See *supra,* at 2.  The unbroken tradi-
tion of on-/off-premises distinctions counsels against the
adoption of Reagan's novel rule.  See *Williams-Yulee* v. *Flor-
ida Bar*, 575 U. S. 433, 446 (2015) (recognizing "history and
tradition of regulation" as relevant when considering the
scope of the First Amendment).[6]

                            D

Tellingly, even today's dissent appears reluctant to em-
brace the read-the-sign rule adopted by the court below.  In-

------

[6] The Court of Appeals, for its part, understood *Reed* to have deemed a
regulation content based solely because "it 'single[d] out signs bearing a
particular message: the time and location of a specific event.'"  972 F. 3d
696, 706 (CA5 2020) (quoting *Reed*, 576 U. S., at 171).  Reagan does not
rely as heavily on this language, and for good reason.  As a preliminary
matter, the *Reed* Court found that the provisions at issue in that case did
not, in fact, "hinge on 'whether and when an event is occurring.'"  *Id.,* at
170.  More fundamentally, those provisions did not target all events gen-
erally, regardless of topic; they targeted "a specific event" (an election)
"because of the topic discussed or the idea or message expressed" (politi-
cal speech).  *Id.,* at 171.  The Court of Appeals' contrary reading would
render the majority opinion in *Reed* irreconcilable with the concurrence,
which recognized that "[r]ules imposing time restrictions on signs adver-
tising a one-time event," which "do not discriminate based on topic or
subject," would be content neutral.  *Id.,* at 174, 175 (ALITO, J., concur-
ring).

stead, the dissent attacks a straw man. Contrary to its accusations, we do not "nullif[y]" *Reed*'s protections, "resuscitat[e]" a decision that we do not cite, or fashion a novel "specificity test" simply by quoting the standard repeatedly enunciated in *Reed*. *Post,* at 9, 11, 21 (opinion of THOMAS, J.). Nor do we cast doubt on any of our precedents recognizing examples of topic or subject-matter discrimination as content based. See, *e.g., post,* at 9–10. We merely apply those precedents to reach the "commonsense" result that a location-based and content-agnostic on-/off-premises distinction does not, on its face, "singl[e] out specific subject matter for differential treatment." *Reed*, 576 U. S., at 163, 169.

It is the dissent that would upend settled understandings of the law. Where we adhere to the teachings of history, experience, and precedent, the dissent would hold that tens of thousands of jurisdictions have presumptively violated the First Amendment, some for more than half a century, and that they have done so by use of an on-/off-premises distinction this Court has repeatedly reviewed and never previously questioned. For the reasons we have explained, the Constitution does not require that bizarre result.

## III

This Court's determination that the City's ordinance is facially content neutral does not end the First Amendment inquiry. If there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction, for instance, that restriction may be content based. See *Reed*, 576 U. S., at 164. Moreover, to survive intermediate scrutiny, a restriction on speech or expression must be "'narrowly tailored to serve a significant governmental interest.'" *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989).

The parties dispute whether the City can satisfy these requirements. This Court, however, is "a court of final review

and not first view," and it does not "[o]rdinarily . . . decide in the first instance issues not decided below." *Zivotofsky* v. *Clinton*, 566 U. S. 189, 201 (2012) (internal quotation marks omitted). "In particular, when we reverse on a threshold question, we typically remand for resolution of any claims the lower courts' error prevented them from addressing." *Ibid.* Because the Court of Appeals did not address these issues, the Court leaves them for remand and expresses no view on the matters.

*        *        *

For these reasons, the judgment of the Court of Appeals for the Fifth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–1029

_____

## CITY OF AUSTIN, TEXAS, PETITIONER *v.* REAGAN NATIONAL ADVERTISING OF AUSTIN, LLC, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 21, 2022]

JUSTICE BREYER, concurring.

*Reed* v. *Town of Gilbert*, 576 U. S. 155 (2015), is binding precedent here. Given that precedent, I join the majority's opinion. I write separately because I continue to believe that the Court's reasoning in *Reed* was wrong. The Court there struck down a city's sign ordinance under the First Amendment. It wrote that the First Amendment requires strict scrutiny whenever a regulation "target[s] speech based on its communicative content." *Id.,* at 163. It therefore concluded that "[c]ontent-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Ibid.*

But the First Amendment is not the Tax Code. Its purposes are often better served when judge-made categories (like "content discrimination") are treated, not as bright-line rules, but instead as rules of thumb. And, where strict scrutiny's harsh presumption of unconstitutionality is at issue, it is particularly important to avoid jumping to such presumptive conclusions without first considering "whether the regulation at issue works harm to First Amendment interests that is disproportionate in light of the relevant regulatory objectives." *Id.,* at 179 (BREYER, J., concurring in judgment); *Barr* v. *American Assn. of Political Consultants,*

*Inc.*, 591 U. S. \_\_\_, \_\_\_–\_\_\_ (2020) (BREYER, J., concurring in judgment and dissenting in part) (slip op., at 9–10); *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 582 (2011) (BREYER, J., dissenting).  Here, I would conclude that the City of Austin's (City's) regulation of off-premises signs works no such disproportionate harm.  I therefore agree with the majority's conclusion that strict scrutiny and its attendant presumption of unconstitutionality are unwarranted.  The majority reaches this conclusion by applying *Reed*'s formal framework, as *stare decisis* requires.  I would add that *Reed*'s strict formalism can sometimes disserve the very First Amendment interests it was designed to protect.

I

The First Amendment helps to safeguard what Justice Holmes described as a marketplace of ideas.  *Abrams* v. *United States,* 250 U. S. 616, 630 (1919) (dissenting opinion).  A democratic people must be able to freely "generate, debate, and discuss both general and specific ideas, hopes, and experiences."  *Barr*, 591 U. S., at \_\_\_ (opinion of BREYER, J.) (slip op., at 3).  They "must then be able to transmit their resulting views and conclusions to their elected representatives, which they may do directly, or indirectly through the shaping of public opinion." *Ibid.*  Those representatives can respond by turning the people's ideas into policies.  The First Amendment, by protecting the "marketplace" and the "transmission" of ideas, thereby helps to protect the basic workings of democracy itself.  See *Meyer* v. *Grant*, 486 U. S. 414, 421 (1988) ("The First Amendment was 'fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people'").

Courts help to protect these democratic values in part by strictly scrutinizing certain categories of laws that threaten to "'drive certain ideas or viewpoints from the marketplace.'"  *R. A. V.* v. *St. Paul*, 505 U. S. 377, 387 (1992).  We

have recognized, for example, that First Amendment values are in danger when the government imposes restrictions upon "'core political speech,'" *Buckley* v. *American Constitutional Law Foundation, Inc.*, 525 U. S. 182, 186–187 (1999); when it discriminates against "particular views taken by speakers on a subject," *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829–830 (1995); and, in some contexts, when it removes "an entire topic" of discussion from public debate, *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 537–538 (1980).

But not all laws that distinguish between speech based on its content fall into a category of this kind. That is in part because many ordinary regulatory programs may well turn on the content of speech without posing any "realistic possibility that official suppression of ideas is afoot." *R. A. V.*, 505 U. S., at 390. Those regulations, rather than hindering the ability of the people to transmit their thoughts to their elected representatives, may constitute the very product of that transmission. *Barr*, 591 U. S., at ___ (opinion of BREYER, J.) (slip op., at 4).

The U. S. Code (as well as its state and local equivalents) is filled with regulatory laws that turn, often necessarily, on the content of speech. Consider laws regulating census reporting requirements, *e.g.,* 13 U. S. C. §224; securities-related disclosures, *e.g.,* 15 U. S. C. §78*l*; copyright infringement, *e.g.,* 17 U. S. C. §102; labeling of prescription drugs, *e.g.,* 21 U. S. C. §353(b)(4)(A), or consumer electronics, *e.g.,* 42 U. S. C. §6294; highway signs, *e.g.,* 23 U. S. C. §131(c); tax disclosures, *e.g.,* 26 U. S. C. §6039F; confidential medical records, *e.g.,* 38 U. S. C. §7332; robocalls, *e.g.,* 47 U. S. C. §227; workplace safety warnings, *e.g.,* 29 CFR §1910.145 (2021); panhandling, *e.g.,* Ala. Code §13A–11–9(a) (2022); solicitation on behalf of charities, *e.g.,* N. Y. Exec. Law Ann. §174–b (West 2019); signs at petting zoos, *e.g.,* N. Y. Gen. Bus. Law Ann. §399–ff(3) (West 2015); and many more.

If *Reed* is taken as setting forth a formal rule that courts must strictly scrutinize regulations simply because they refer to particular content, we have good reason to fear the consequences of that decision. One possibility is that courts will strike down "'entirely reasonable'" regulations that reflect the will of the people. *Reed*, 576 U. S., at 171; *e.g., Barr*, 591 U. S., at ___ (slip op., at 9) (striking down the Telephone Consumer Protection Act's exception allowing robocalls that collect government debt); *IMDB.com* v. *Becerra*, 962 F. 3d 1111, 1125–1127 (CA9 2020) (striking down a California law prohibiting certain websites from publishing the birthdates of entertainment professionals). If so, the Court's content-based line-drawing will "substitut[e] judicial for democratic decisionmaking" and threaten the ability of the people to translate their ideas into policy. *Sorrell*, 564 U. S., at 603 (BREYER, J., dissenting).

A second possibility is that courts instead will (perhaps unconsciously) dilute the stringent strict scrutiny standard in an effort to avoid striking down reasonable regulations. Doing so would "weaken the First Amendment's protection in instances where 'strict scrutiny' should apply in full force." *Reed*, 576 U. S., at 178 (opinion of BREYER, J.).

A third possibility is that courts will develop a matrix of formal subsidiary rules and exceptions that seek to distinguish between reasonable and unreasonable content-based regulations. Such a patchwork, however, may prove overly complex, unwieldy, or unworkable. And it may make it more difficult for ordinary Americans to understand the importance of First Amendment values and to live their lives in accord with those values.

For these reasons, as I have said before, I would reject *Reed's* approach, which too rigidly ties content discrimination to strict scrutiny (and, consequently, to "almost certain legal condemnation"). *Id.*, at 176. Instead, I would treat content discrimination as a rule of thumb to be applied with what JUSTICE KAGAN has called "a dose of common sense."

*Id.,* at 183 (opinion concurring in judgment). Where content-based regulations are at issue, I would ask a more basic First Amendment question: Does "the regulation at issue wor[k] harm to First Amendment interests that is disproportionate in light of the relevant regulatory objectives"? *Id.,* at 179 (opinion of BREYER, J.). I believe we should answer that question by examining "the seriousness of the harm to speech, the importance of the countervailing objectives, the extent to which the law will achieve those objectives, and whether there are other, less restrictive ways of doing so." *Ibid.*

## II

The regulation at issue in this case is the City of Austin's sign code, which regulates billboards and other "off-premises" signs. The City defines an "off-premises" sign as "a sign advertising a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that directs persons to any location not on that site." Austin, Tex., City Code §25–10–3(11) (2016).

Some years ago, the City forbid construction of new off-premises signs. §25–10–102(1). At the same time, it grandfathered in existing off-premises signs, allowing them to remain but subjecting them to regulation. §§25–10–3(10), 25–10–152(A), (B). Owners of grandfathered off-premises signs are allowed to change the face of their signs, but not to digitize them. *Ibid.* In the case before us, owners who wanted to digitize their off-premises signs challenged the City's regulation on the ground that it violates the First Amendment.

The Court remands for the lower courts to assess the constitutionality of this regulation in the first instance, so I need not answer that question conclusively now. I wish only to illustrate why I believe a strong presumption of unlawfulness is out of place here.

Billboards and other roadside signs can generally be categorized as a form of outdoor advertising. Regulation of outdoor advertising in order to protect the public's interest in "avoiding visual clutter," *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 806 (1984), or minimizing traffic risks, *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 507–508 (1981), is unlikely to interfere significantly with the "marketplace of ideas." In this case, for example, there is no evidence that the City regulated off-premises signs in order to censor a particular viewpoint or topic, or that its regulations have had that effect in practice. There is consequently little reason to apply a presumption of unconstitutionality to this kind of regulation.

Without such a presumption, I would weigh the First Amendment harms that a regulation imposes against the regulatory objectives that it serves. The City's regulation here appears to work at most a limited, niche-like harm to First Amendment interests. Respondents own a number of grandfathered off-premises signs. They can use those signs to communicate whatever messages they choose. They complain only that they cannot digitize the signs, which would allow them to display several messages in rapid succession. Perhaps digitization would enable them to make more effective use of their billboard space. But their inability to maximize the use of their space in this way is unlikely to meaningfully interfere with their participation in the "marketplace of ideas."

At the same time, the City has asserted a legitimate interest in maintaining the regulation. As I have said, the public has an interest in ensuring traffic safety and preserving an esthetically pleasing environment, *supra* this page, and the City here has reasonably explained how its regulation of off-premises signs in general, and digitization in particular, serves those interests. *Amici* tell us that billboards, especially digital ones, can distract drivers and cause accidents. See, *e.g.,* Brief for United States as *Amicus*

*Curiae* 21 (citing a study of 450 crashes in Alabama and Florida that "revealed that the presence of digital billboards increased the overall crash rates in areas of billboard influence"); Brief for National League of Cities et al. as *Amici Curiae* 22 ("'The Wisconsin Department of Transport found a 35% increase in collisions near a variable message sign'" (alteration omitted)). They add that on-premises signs are less likely to cause accidents. *Id.,* at 23 ("[A] 2014 study found no evidence that on premises digital signs led to an increase in crashes"). The City further says that billboards cause more visual clutter than on-premises signs because the latter are "typically 'small in size' and integrated into the premises." Reply Brief 19.

I would leave for the courts below to weigh these harms and interests, and any alternatives, in the first instance, without a strong presumption of unconstitutionality.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–1029

_____

## CITY OF AUSTIN, TEXAS, PETITIONER *v.* REAGAN NATIONAL ADVERTISING OF AUSTIN, LLC, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 21, 2022]

JUSTICE ALITO, concurring in the judgment in part and dissenting in part.

I agree with the majority that we must reverse the decision of the Court of Appeals holding that the provisions of the Austin City Code regulating on- and off-premises signs are facially unconstitutional. *Ante*, at 6. The Court of Appeals reasoned that those provisions impose content-based restrictions and that they cannot satisfy strict scrutiny, but the Court of Appeals did not apply the tests that must be met before a law is held to be facially unconstitutional. "Normally, a plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep.'" *Americans for Prosperity Foundation* v. *Bonta*, 594 U. S. ___, ___ (2021) (slip op., at 15) (citation omitted). A somewhat less demanding test applies when a law affects freedom of speech. Under our First Amendment "overbreadth" doctrine, a law restricting speech is unconstitutional "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States* v. *Stevens*, 559 U. S. 460, 473 (2010) (internal quotation marks omitted).

In this case, the Court of Appeals did not apply either of those tests, and it is doubtful that they can be met. Many

(and possibly the great majority) of the situations in which the relevant provisions may apply involve commercial speech, and under our precedents, regulations of commercial speech are analyzed differently. See *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 571–572 (2011).

It is also questionable whether those code provisions are unconstitutional as applied to most of respondents' billboards. It appears that most if not all of those billboards are located off-premises in both the usual sense of that term,[1] and in the sense in which the term is used in the Austin code. See Austin, Tex., City Code §25–10–3(11) (2016) (a sign is off-premises if it "advertis[es] a business, person, activity, goods, products, or services not located on the site where the sign is installed" or if it "directs persons to any location not on that site"). The record contains photos of some of these billboards, see App. 130–147, and all but one appears to be located on otherwise vacant land. Thus, they are clearly off-premises signs, and because they were erected before the enactment of the code provisions at issue, the only relevant restriction they face is that they cannot be digitized.[2] The distinction between a digitized and non-digitized sign is not based on content, topic, or subject matter. Even if the message on a billboard were written in a secret code, an observer would have no trouble determining whether it had been digitized.

Because the Court of Appeals erred in holding that the code provisions are facially unconstitutional, I agree that

_____

[1] In ordinary usage, a sign that is attached to or located in close proximity to a building is not described as located "off-premises." The distinction between on- and off-premises signs is based solely on location, and that is why such a classification is not content-based. See *Reed* v. *Town of Gilbert*, 576 U. S. 155, 175 (2015) (ALITO, J., concurring).

[2] A grandfathered sign can be maintained at its existing location, but the owner cannot "increase the degree of the existing nonconformity," "change the method or technology used to convey a message," or "increase the illumination of the sign." Austin, Tex., City Code §§25–10–152(A)–(B).

we should reverse that decision. On remand, the lower courts should determine whether those provisions are unconstitutional as applied to each of the billboards at issue.

Today's decision, however, goes further and holds flatly that "[t]he sign code provisions challenged here do not discriminate" on the basis of "'the topic discussed or the idea or message expressed,'" *ante*, at 10, and that categorical statement is incorrect. The provisions defining on- and off-premises signs clearly discriminate on those grounds, and at least as applied in some situations, strict scrutiny should be required.

As the Court notes, under the provisions in effect when petitioner's applications were denied, a sign was considered to be off-premises if it "advertis[ed]," among other things, a "person, activity, . . . or servic[e] not located on the site where the sign is installed" or if it "direct[ed] persons to any location not on that site." Austin, Tex., City Code §25–10–3(11). Consider what this definition would mean as applied to signs posted in the front window of a commercial establishment, say, a little coffee shop. If the owner put up a sign advertising a new coffee drink, the sign would be classified as on-premises, but suppose the owner instead mounted a sign in the same location saying: "Contribute to X's legal defense fund" or "Free COVID tests available at Y pharmacy" or "Attend City Council meeting to speak up about Z." All those signs would appear to fall within the definition of an off-premises sign and would thus be disallowed. See also *post*, at 3–4 (THOMAS, J., dissenting). Providing disparate treatment for the sign about a new drink and the signs about social and political matters constitutes discrimination on the basis of topic or subject matter. The code provisions adopted in 2017 are worded differently, but the new wording may not rule out similar results.[3]

_____

[3] The amended code now defines "off-premise[s] sign" as "a sign that

For these reasons, I would simply hold that the provisions at issue are not facially unconstitutional, and I would refrain from making any broader pronouncements.

––––––––––

displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution, or other commercial message which is generally conducted, sold, manufactured, produced, offered, or occurs elsewhere than on the premises where the sign is located," and defines an "on-premise[s] sign" as "a sign that is not an off-premise[s] sign."  Austin, Tex., City Code §§25–10–4(9)–(10) (2021). It is not clear that the inclusion of "other commercial message" modifies the terms "activity," "event," "person," or "institution" such that the provision would not draw topic-based distinctions as applied to non-commercial speech.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–1029

_____

## CITY OF AUSTIN, TEXAS, PETITIONER *v.* REAGAN NATIONAL ADVERTISING OF AUSTIN, LLC, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 21, 2022]

JUSTICE THOMAS, with whom JUSTICE GORSUCH and JUSTICE BARRETT join, dissenting.

In *Reed* v. *Town of Gilbert*, 576 U. S. 155 (2015), we held that a speech regulation is content based—and thus presumptively invalid—if it "draws distinctions based on the message a speaker conveys." *Id.*, at 163. Here, the city of Austin imposes special restrictions on "off-premise[s] sign[s]," defined as signs that "advertis[e] a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that direc[t] persons to any location not on that site." Austin, Tex., City Code §25–10–3(11) (2016). Under *Reed*, Austin's off-premises restriction is content based. It discriminates against certain signs based on the message they convey—*e.g.*, whether they promote an on- or off-site event, activity, or service.

The Court nevertheless holds that the off-premises restriction is content neutral because it proscribes a sufficiently broad category of communicative content and, therefore, does not target a specific "topic or subject matter." *Ante*, at 8. This misinterprets *Reed*'s clear rule for content-based restrictions and replaces it with an incoherent and malleable standard. In so doing, the majority's reasoning is reminiscent of this Court's erroneous decision in *Hill* v. *Colorado*, 530 U. S. 703 (2000), which upheld a blatantly

content-based prohibition on "counseling" near abortion clinics on the ground that it discriminated against "an extremely broad category of communications." *Id.*, at 723. Because I would adhere to *Reed* rather than echo *Hill*'s long-discredited approach, I respectfully dissent.

## I

## A

The First Amendment, applicable to the States through the Fourteenth, prohibits laws "abridging the freedom of speech." U. S. Const., Amdt. 1; see also *Stromberg* v. *California*, 283 U. S. 359, 368 (1931). "When enforcing this prohibition, our precedents distinguish between content-based and content-neutral regulations." *National Institute of Family and Life Advocates* v. *Becerra*, 585 U. S. ___, ___ (2018) (slip op., at 6). A content-based law is "presumptively invalid," *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 817 (2000) (internal quotation marks omitted), and may generally be upheld only if the government proves that the regulation is narrowly tailored to serve compelling state interests, *R. A. V.* v. *St. Paul*, 505 U. S. 377, 395 (1992).[1]

In *Reed* v. *Town of Gilbert*, we held that courts should identify content-based restrictions by applying a "commonsense" test: A speech regulation is content based if it

_____

[1] For several categories of historically unprotected speech, including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct, the government ordinarily may enact content-based restrictions without satisfying strict scrutiny. See *United States* v. *Stevens*, 559 U. S. 460, 468–469 (2010). This Court's precedents have also declined to apply strict scrutiny to several other types of content-based restrictions, including laws targeting "commercial speech." *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 561–566 (1980). But see *Lorillard Tobacco Co.* v. *Reilly*, 533 U. S. 525, 572 (2001) (THOMAS, J., concurring in part and concurring in judgment). As the Court recognizes, Austin's off-premises sign rule is not limited to any of these categories of speech. See *ante,* at 5, n. 3.

"target[s] speech based on its communicative content." 576 U. S., at 163. Put another way, a law is content based "'on its face' [if it] draws distinctions based on the message a speaker conveys." *Ibid.* While we noted that "[s]ome facial distinctions based on a message are obvious," we emphasized that others could be "more subtle, defining regulated speech by its function or purpose." *Ibid.* In all events, whether a law is characterized as targeting a "topic," "idea," "subject matter," or "communicative content," the law is content based if it draws distinctions based in any way "on the message a speaker conveys." *Id.*, at 163–164.[2]

Applying this standard, we held that the town of Gilbert's sign code was "a paradigmatic example of content-based discrimination" because it classified "various categories of signs based on the type of information they convey[ed], [and] then subject[ed] each category to different restrictions." *Id.*, at 169, 159. For instance, Gilbert defined "'Temporary Directional Signs'" as any sign that "convey[ed] the message of directing the public to [a] 'qualifying event,'" and permitted their display for no more than 12 hours before and 1 hour after the event occurred. *Id.*, at 164, 161. Meanwhile, "'Ideological Sign[s],'" defined as any sign (not covered by another category) that "'communicat[ed] a message or ideas for noncommercial purposes,'" were subject to no temporal limitations. *Id.*, at 159–160. In short, the restrictions on any given sign depended "on the communicative content of the sign." *Id.*, at 164. Gilbert's

---

[2] In *Reed*, we acknowledged that some prior decisions had skipped over this facial analysis and applied a justification-focused test. See 576 U. S., at 165–167. But we explained that the justification-focused test implicated a "separate and additional category of laws that, though facially content neutral, [are] content-based regulations [because they] cannot be '"justified without reference to the content of the regulated speech,"' or . . . were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.,* at 164 (quoting *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989)). All agree that this second type of content-based regulation is not at issue here.

sign code was thus facially content based and presumptively unlawful. See *id.*, at 159.

In contrast to *Reed*'s "commonsense" test, Gilbert urged us to define "content based" as a "term of art that 'should be applied flexibly' with the goal of protecting 'viewpoints and ideas from government censorship or favoritism.'" *Id.*, at 168. Such a functionalist test, Gilbert argued, could ferret out illicit government motives while obviating the need to subject reasonable laws to strict scrutiny. See *ibid.* We rejected Gilbert's attempt to cast the phrase "content based" as a "term of art" because "[i]nnocent motives do not eliminate the danger of censorship presented by a facially content-based statute." *Id.*, at 167. We noted that "one could easily imagine a Sign Code compliance manager who disliked [a] Church's substantive teachings deploying the Sign Code to make it more difficult for the Church to inform the public of the location of its services." *Id.*, at 167–168. Thus, we concluded that "a clear and firm rule governing content neutrality is an essential means of protecting the freedom of speech, even if laws that might seem entirely reasonable will sometimes be struck down because of their content-based nature." *Id.*, at 171 (internal quotation marks omitted).

We also rejected the Ninth Circuit's reasoning that Gilbert's sign restrictions were content neutral because they depended on "the content-neutral elements of . . . whether and when an event is occurring." *Id.*, at 169 (internal quotation marks omitted). That is, whether a temporary directional sign was permissible depended, in part, on its temporal proximity to a "'qualifying event.'" *Id.*, at 164. This partial dependence on content-neutral elements was immaterial, we explained, because the restrictions also depended on the signs' communicative content. Gilbert officials still had to examine a sign's message to determine what type of sign it was, and this "obvious content-based inquiry d[id] not evade strict scrutiny simply because an

event [was] involved." *Id.*, at 170.

## B

Under *Reed*'s approach for identifying content-based regulations, Austin's off-premises sign restriction is content based. As relevant to this suit, Austin's sign code imposes stringent restrictions on a category of "off-premise[s] sign[s]." §25–10–3(11). The code defines "off-premise[s] sign[s]" as those "advertising a business, person, activity, goods, products, or services not located on the site where the sign is installed," or as signs "direct[ing] persons to any location not on that site." *Ibid.* This broad definition sweeps in a wide swath of signs, from 14- by 48-foot billboards to 24- by 18-inch yard signs. The sign code prohibits new off-premises signs and makes it difficult (or impossible) to change existing off-premises signs, including by digitizing them. See *ante*, at 3.

Like the town of Gilbert in *Reed*, Austin has identified a "categor[y] of signs based on the type of information they convey, [and] then subject[ed that] category to different restrictions." 576 U. S., at 159. A sign that conveys a message about off-premises activities is restricted, while one that conveys a message about on-premises activities is not. See *id.*, at 171 (regulating signs based on "a particular message" about "the time and location of a specific event" is content based). And, per *Reed*, it does not matter that Austin's code "defin[es] regulated speech by its function or purpose"—*i.e.*, advertising or directing passersby elsewhere. *Id.*, at 163. Again, all that matters is that the regulation "draws distinctions based on" a sign's "communicative content," which the off-premises restriction plainly does. *Ibid.*

This conclusion is not undermined because the off-premises sign restriction depends in part on a content-neutral element: the location of the sign. Much like in *Reed*, that an Austin official applying the sign code must know

*where* the sign is does not negate the fact that he also must know *what* the sign says. Take, for instance, a sign outside a Catholic bookstore. If the sign says, "Visit the Holy Land," it is likely an off-premises sign because it conveys a message directing people elsewhere (unless the name of the bookstore is "Holy Land Books"). But if the sign instead says, "Buy More Books," it is likely a permissible on-premises sign (unless the sign also contains the address of another bookstore across town). Finally, suppose the sign says, "Go to Confession." After examining the sign's message, an official would need to inquire whether a priest ever hears confessions at that location. If one does, the sign could convey a permissible "on-premises" message. If not, the sign conveys an impermissible off-premises message. Because enforcing the sign code in any of these instances "requires [Austin] officials to determine whether a sign" conveys a particular message, the sign code is content based under *Reed*. *Id.*, at 170.

In sum, the off-premises rule is content based and thus invalid unless Austin can satisfy strict scrutiny. See *Playboy Entertainment Group*, 529 U. S., at 813. Because Austin has offered nothing to make that showing, the Court of Appeals did not err in holding that the off-premises rule violates the First Amendment.

## II

To reach the opposite result, the majority implicitly rewrites *Reed*'s bright-line rule for content-based restrictions. In the majority's view, the off-premises restriction is not content based because it does not target a specific "topic or subject matter." *Ante*, at 8. The upshot of the majority's reasoning appears to be that a regulation based on a sufficiently general or broad category of communicative content is not actually content based.

Such a rule not only conflicts with *Reed* and many pre-*Reed* precedents but is also incoherent and unworkable.

Tellingly, the only decision that even remotely supports the majority's rule is one it does not cite: *Hill* v. *Colorado*. There, the Court held that an undeniably content-based law was nonetheless content neutral because it discriminated against "an extremely broad category of communications," supposedly without regard to "subject matter." 530 U. S., at 723. The majority's decision today is erroneous for the same reasons that *Hill* is an aberration in our case law.

## A

The majority concedes that "[t]he message on the sign matters" when applying Austin's sign code. *Ante*, at 8. That concession should end the inquiry under *Reed*. But the majority nonetheless finds the sign code to be content neutral by recasting facially content-based restrictions as only those that target sufficiently specific categories of communicative content and not as those that depend on communicative content *simpliciter*.

For example, while *Reed* defined content-based restrictions as those that "dra[w] distinctions based on the *message* a speaker conveys," 576 U. S., at 163 (emphasis added), the majority decides that Austin's sign code is not content based because it draws no distinctions based on "[a] sign's *substantive* message," *ante*, at 8 (emphasis added). Elsewhere, the majority speaks not of "substantive message[s]" but of "topic[s] or subject matter[s]," which the majority thinks are sufficiently *specific* categories of communicative content. *Ibid.* As a result, the majority contends that a law targeting directional messages concerning "events generally, regardless of topic," would not be content based, but one targeting "directional messages concerning *specific* events" (*e.g.*, "religious" or "political" events) would be. *Ante*, at 12, n. 6, 8 (emphasis added).[3] Regardless of the

_____

[3] On this point, the majority's analysis tracks the position advanced by

label, the majority today excises, without a word of expla-
nation, a subset of supposedly non-substantive or unspecific
messages from the First Amendment's protection against
content-based restrictions.

This understanding of content-based restrictions contra-
venes *Reed*, which held that a law is content based if it "tar-
get[s] speech based on its communicative content"—not
"specific" or "substantive" categories of communicative con-
tent. 576 U. S., at 163; see also, *e.g.*, *Norton* v. *Springfield*,
806 F. 3d 411, 412 (CA7 2015) ("*Reed* effectively abolishes
any distinction between content regulation and subject-
matter regulation. Any law distinguishing one kind of
speech from another by reference to its meaning now re-
quires a compelling justification"). Only by jettisoning
*Reed*'s "commonsense" definition of what it means to be con-
tent based can the majority assert that the off-premises
rule is strictly "location-based" and "agnostic as to content,"
*ante*, at 6, even though the law undeniably depends on *both*
location *and* communicative content, *supra*, at 5–6.

Moreover, the majority's suggestion that laws targeting
broad categories of communicative content are not content
based is hard to square with the sign categories that *Reed*
invalidated. For instance, we found Gilbert's expansive def-
inition of "Ideological Sign[s]" to be content based even
though it broadly covered any "sign communicating a mes-
sage or ideas for noncommercial purposes" that did not al-
ready fall into one of the other categories. 576 U. S., at 159
(internal quotation marks omitted). Nor did we suggest
that the outcome in *Reed* would have been different if the
sign categories were defined even more generally.

The majority answers that it is not "fashion[ing] a novel

---

Austin, which asserted that content neutrality was a "question of gener-
ality." Tr. of Oral Arg. 14; see also *id.,* at 19 (explaining that whether a
law is content based turns on the "level of specificity" at which the gov-
ernment regulates speech).

'specificity test,'" but instead "simply" "quoting the standard repeatedly enunciated in *Reed*." *Ante*, at 13. The majority finds this alleged specificity test in a paragraph near the end of *Reed*, where we noted that a law "targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter," and then affirmed that Gilbert's sign code "single[d] out specific subject matter for differential treatment." 576 U. S., at 169.

These statements never purported to endorse a specificity test of the sort now suggested by the majority. Read in context, *Reed*'s two references to "specific subject matter" naturally address laws that target a "subject matter," however broadly defined, as opposed to some other subject matter; they did not refer only to laws targeting some sufficiently "specific" category of "subject matter." Moreover, the concept of "specificity" or "generality" appears nowhere in the part of *Reed* that set forth its "commonsense" test for content neutrality. See *id.*, at 163–164. If *Reed*'s content-neutrality test turned on specificity, we would have said so explicitly when stating the test. Finally, even crediting the majority's strained reading of *Reed*'s passing references to "specific subject matter," the paragraph where they appear made clear that it was describing only "a paradigmatic *example* of content-based discrimination." *Id.*, at 169 (emphasis added). That part of *Reed* never professed to announce a comprehensive rule with respect to all laws targeting speech based on its communicative content.

Our pre-*Reed* precedents likewise foreclose a construction of "content based" that applies only to some content. We have held many capacious speech regulations to be content based, including restrictions on "'advice or assistance derived from scientific, technical or other specialized knowledge,'" *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 12–13 (2010); "'advertising, promotion, or any activity . . . used to influence sales or the market share of a

prescription drug,'" *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 559 (2011); "editorializing," *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364, 382–383, and n. 14 (1984); "'[publication] for philatelic, numismatic, educational, historical, or newsworthy purposes,'" *Regan* v. *Time, Inc.*, 468 U. S. 641, 644 (1984); and "anonymous speech," *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 348, 357 (1995). These speech categories are no more "specific" or "substantive" than messages regarding off-premises activities. And some of these examples, like "editorializing" or publishing "newsworthy" information, are clearly *less* so. What unites these speech restrictions is that their application turns "on the nature of the message being conveyed," *Carey* v. *Brown*, 447 U. S. 455, 461 (1980), not whether they regulate specific or general categories of speech, or whether they address substantive or non-substantive categories of speech.

We have defined content-based restrictions to include *all* content-based distinctions because any other rule would be incoherent. After all, off-premises advertising could be considered a "subject" or a "topic" as those words are ordinarily used. See *L. D. Management Co.* v. *Gray*, 988 F. 3d 836, 839 (CA6 2021) (off-premises billboard restriction "turns on the '*topic* discussed'" (emphasis added)). And, in any event, there is no principled way to decide whether a category of communicative content is "substantive" or "specific" enough for the majority to deem it a "topic" or "subject" worthy of heightened protection. Although off-premises advertising is a more general category of speech than some (*e.g.*, off-premises advertising of religious events), it is a more specific category than others (*e.g.*, advertising generally). The majority offers only its own *ipse dixit* to explain why off-premises advertising is insufficiently specific to qualify as content based under *Reed*. Worse still, the majority does not explain how courts should draw the line between a sufficiently substantive or specific content-based classification and one that is insufficiently substantive or specific.

On this point, Austin suggests there is no need to worry because our cases provide "guideposts" from which one can divine what "level of generality" renders a speech regulation content based. Tr. of Oral Arg. 18, 24. To be sure, that is the sort of inquiry the majority's opaque test invites. But *Reed* directed us elsewhere—to the text of the law in question and whether that law "'on its face' draws distinctions based on the message a speaker conveys." 576 U. S., at 163. The majority's holding that some rules based on content are not, as it turns out, content based nullifies *Reed*'s clear test.

## B

The majority offers several reasons why its approach is consistent with *Reed* and other cases. None of these arguments is persuasive. Instead, they only serve to underscore the Court's ill-advised departure from our doctrine.

### 1

The majority first suggests that deeming Austin's sign code content based would require us to adopt an "extreme" reinterpretation of *Reed*. *Ante*, at 6. Specifically, the majority faults the Court of Appeals for concluding that Austin's regulation was content based because, to enforce the off-premises rule, "'[a] reader must ask: who is the speaker and what is the speaker saying'"? *Ibid.* (quoting 972 F. 3d 696, 706 (CA5 2020)). In the majority's view, *Reed* cannot stand for such a simplistic read-the-sign test.

The majority's skepticism is misplaced. We have often acknowledged that the need to examine the content of a message is a strong indicator that a speech regulation is content based. One year before *Reed*, for example, we stated that an abortion clinic buffer-zone law "would be content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen* v. *Coakley*, 573 U. S. 464, 479 (2014) (internal quotation

marks omitted). That statement was not an outlier. See, *e.g.*, *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 230 (1987) (tax exemption for periodicals "uniformly devoted to religion or sports" was content based because it required state officials to "examine the content of the message" (internal quotation marks omitted)); *Forsyth County* v. *Nationalist Movement*, 505 U. S. 123, 134 (1992) (regulation requiring parade organizers to pay a fee depending on the security costs anticipated for the event was content based because "[i]n order to assess accurately the cost of security for parade participants, the administrator must necessarily examine the content of the message that is conveyed" (internal quotation marks omitted)); *League of Women Voters*, 468 U. S., at 366, 383 (law forbidding public broadcasting stations from "engag[ing] in editorializing" was content based because it required "enforcement authorities [to] necessarily examine the content of the message that is conveyed" (internal quotation marks omitted)).

Ultimately, the majority's objection to the Court of Appeals' reliance on a read-the-sign test is a red herring; its real objection is to *Reed*'s rule that any law that draws distinctions based on communicative content is content based.

2

The majority next argues that Austin's sign code is content neutral under our precedents. See *ante*, at 8–10. But none of the cases the majority cites supports its crabbed view of what constitutes a content-based restriction.

First, in *Heffron* v. *International Soc. for Krishna Consciousness, Inc.*, 452 U. S. 640 (1981), the Court upheld, as content neutral, an ordinance providing that the "[s]ale or distribution of any merchandise, including printed or written material," could occur only from certain booths at the fairgrounds. *Id.*, at 643 (internal quotation marks omitted). Such a statute is facially content neutral under *Reed* because it does not "'on its face' dra[w] distinctions

based on the message a speaker conveys" when selling or distributing merchandise subject to the ordinance. 576 U. S., at 163. True, the Court construed the ordinance also to limit "fund solicitation operations," 452 U. S., at 644, but that was not, as the majority claims, a prohibition on "asking for donations," *ante*, at 9. Rather, anyone was free to "as[k] for donations" wherever he liked, because the ordinance did "not prevent respondents from wandering throughout the fairgrounds and directing interested donors or purchasers to their booth." 452 U. S., at 664, n. 2 (Blackmun, J., concurring in part and dissenting in part). Then, once "at the booth," the donor could "make a contribution." *Ibid.*

Second, in *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940), the Court invalidated a licensing system for religious and charitable solicitation while acknowledging in dicta that a State could regulate the time, place, and manner of solicitation. *Id.*, at 304, 307. But here, we are not faced with a true time, place, or manner restriction, as even the majority concedes. See *ante*, at 8.[4] And, in any event, *Cantwell* did not suggest that a content-based restriction could be sustained as a time, place, or manner restriction; its analysis focused predominantly on the plaintiff's free exercise claim; and the case predated our modern content-neutrality doctrine by nearly three decades. Thus, nothing in *Heffron* or *Cantwell* supports the majority's narrow approach to identifying content-based restrictions.

——————

[4] The majority says only that Austin's sign code is "similar" to a time-place-manner restriction, citing *Frisby* v. *Schultz*, 487 U. S. 474 (1988). *Ante,* at 8. But *Frisby* upheld an ordinance that regulated only *where* picketing may take place and not *what* message the picketers could communicate. See 487 U. S., at 477 (ordinance made it "unlawful for any person to engage in picketing before or about the residence or dwelling of any individual" (internal quotation marks omitted)); cf. *Hill* v. *Colorado*, 530 U. S. 703, 766 (2000) (Kennedy, J., dissenting) ("[n]o examination of the content of a speaker's message is required to determine whether an individual is picketing").

Finally, the majority argues that we have "previously understood distinctions between on-premises and off-premises signs . . . to be content neutral." *Ante*, at 9–10. To be sure, in both *Suffolk Outdoor Adv. Co.* v. *Hulse*, 439 U. S. 808 (1978), and *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 503–512 (1981) (plurality opinion), this Court suggested that some restrictions on off-premises advertising were constitutional. And later, in *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789 (1984), the Court described *Metromedia* as upholding "a *content-neutral* prohibition against the use of billboards." 466 U. S., at 807 (emphasis added). But the statement in *Vincent* was dictum, and, as the majority concedes, both our summary decision in *Suffolk* and the plurality opinion in *Metromedia* sanctioned off-premises restrictions only insofar as they applied to *commercial* speech. *Ante*, at 10. That is, the "Court did not need to decide"—and did not decide—"whether the off-premises prohibition was content based" because restrictions on commercial speech are "subject to intermediate scrutiny in any event." *Ibid.*

3

The majority also claims that finding Austin's sign code to be content based "would render the majority opinion in *Reed* irreconcilable with" JUSTICE ALITO's *Reed* concurrence. *Ante*, at 12, n. 6. In particular, JUSTICE ALITO identified nine different types of sign regulations that he believed "would not be content based," including "[r]ules distinguishing between on-premises and off-premises signs" and "[r]ules imposing time restrictions on signs advertising a one-time event." 576 U. S., at 174–175. The majority evidently believes that these two types of sign regulations necessarily turn on a sign's communicative content, like the off-premises sign restriction at issue here.

That reading of the *Reed* concurrence makes little sense.

First, there is no reason to interpret the concurrence as referring to off-premises or one-time-event rules that turn on a sign's communicative content. Doing so would make those two rules categorically different from the other seven, none of which would ever turn on message content. See, *e.g.*, *id.*, at 174 ("Rules distinguishing between lighted and unlighted signs"). And although off-premises and one-time-event rules *could* be drafted in terms of a sign's communicative content, as is true here, they need not be. "There might be many formulations of an on/off-premises distinction that are content-neutral." *Thomas* v. *Bright*, 937 F. 3d 721, 733 (CA6 2019); see also *ante*, at 2, n. 1 (ALITO, J., concurring in judgment in part and dissenting in part) (explaining that "[i]n ordinary usage" an "off-premises" sign is one that is not "attached to or located in close proximity to a building"). For instance, a city could define "'an o[n]-premise[s] sign as any sign within 500 feet of a building,'" 937 F. 3d, at 732, or a sign that is installed by "'a business . . . licensed to occupy . . . the premises where the sign is located,'" Brief for Summus Outdoor as *Amicus Curiae* 10. As for regulations of one-time-event signs, Austin itself amended its sign code, at the behest of its lawyers, specifically to make its ordinance content neutral. See Austin, Tex., City Code §25–10–102(D) (2021); App. 152. Thus, interpreting JUSTICE ALITO's concurrence as referring to rules that turn on communicative content, as opposed to rules that are content neutral, is unwarranted.

Second, it would be strange to interpret the concurrence as proclaiming that *all* off-premises sign restrictions are content neutral considering the longstanding dispute over that question. In fact, 20 years before *Reed*, then-Judge Alito opined that there was "no easy answer to [the] question" whether "exceptions for 'for sale' signs and signs relating to on-site activities" would render a sign code content based. *Rappa* v. *New Castle County*, 18 F. 3d 1043, 1080

(CA3 1994) (concurring opinion); see also, *e.g.*, *Ackerly Communications of Mass.*, *Inc.* v. *Cambridge*, 88 F. 3d 33, 36, n. 7 (CA1 1996) ("In 'commonsense' terms, the distinction surely is content-based because determining whether a sign must stay up or must come down requires consideration of the message it carries"); *Norton Outdoor Adv.*, *Inc.* v. *Arlington Heights*, 69 Ohio St. 2d 539, 541, 433 N. E. 2d 198, 200 (1982) ("In prohibiting all forms of offsite billboard advertising, the ordinance is thus inescapably directed to the content of protected speech"). Ultimately, it seems quite unlikely that JUSTICE ALITO's quick recital of some content-neutral rules purported to pre-emptively decide an issue that had long perplexed federal and state courts.

4

Near the end of its analysis, the majority invokes an allegedly "unbroken tradition of on-/off-premises distinctions" that it claims "counsels against" faithful application of *Reed*. *Ante*, at 12. To be sure, history and tradition are relevant to identifying and defining those "few limited areas" where, "[f]rom 1791 to the present," "the First Amendment has permitted restrictions upon the content of speech." *Brown* v. *Entertainment Merchants Assn.*, 564 U. S. 786, 791 (2011) (internal quotation marks omitted); see *supra*, at 2, n. 1. But the majority openly admits that off-premises regulations "were not present [at] the founding." *Ante*, at 12. And while it asserts that "large outdoor advertisements proliferated in the 1800s," *ibid.*, it offers no evidence of any content-based restrictions from that period, let alone off-premises restrictions on *noncommercial* speech. The *earliest* example of an off-premises restriction that the majority cites arose in *Packer Corp.* v. *Utah*, 285 U. S. 105 (1932), but that case involved a restriction on *commercial* advertising and did not even feature a First Amendment claim. See *id.*, at 108–112.

Ultimately, the majority's only "historical" support is that

regulations like Austin's "proliferated following the enact-
ment of the Highway Beautification Act of 1965." *Ante*, at
2. The majority's suggestion that the First Amendment
should yield to a speech restriction that "proliferated"—
under pressure from the Federal Government—some two
centuries after the founding is both "startling and danger-
ous." *United States* v. *Stevens*, 559 U. S. 460, 470 (2010).
This Court has never hinted that the government can, with
a few decades of regulation, subject "new categories of
speech" to less exacting First Amendment scrutiny. *Id.*, at
472.

Regardless, even if this allegedly "unbroken tradition"
did not fall short by a century or two, the majority offers no
explanation why historical regulation is relevant to the
question whether the off-premises restriction is content
based under *Reed* and our modern content-neutrality juris-
prudence. If Austin had met its burden of identifying a
historical tradition of analogous regulation—as can be
done, say, for obscenity or defamation—that would not
make the off-premises rule content neutral. It might simply
mean that the off-premises rule is a constitutional form of
content-based discrimination. But content neutrality un-
der *Reed* is an empirical question, not a historical one.
Thus, the majority's historical argument is not only merit-
less but misguided.

## C

Despite asserting that the Court of Appeals' analysis un-
der *Reed* would "contravene numerous precedents," *ante*, at
11, the majority identifies no decision of this Court support-
ing the idea that a speech restriction is not content based
so long as it regulates a sufficiently broad or non-
substantive category of communicative content. In fact,
there is only one case that could possibly validate the ma-
jority's aberrant analysis: *Hill* v. *Colorado*. That *Hill* is the
majority's only support underscores the danger that today's

decision poses to the First Amendment.

*Hill* involved a law that prohibited persons outside abortion clinics from knowingly approaching within eight feet of another person without consent "for the purpose of . . . engaging in oral protest, education, or counseling." 530 U. S., at 707 (internal quotation marks omitted). *Hill* concluded, implausibly, that this regulation was content neutral.

The majority's reasoning in this case is just as implausible. The majority asserts that the off-premises rule is not content based because it does not target a sufficiently "specific" or "substantive" category of communications. *Ante*, at 8. *Hill* correspondingly held that restrictions on "protest, education, or counseling" were not content-based classifications because they cover "an extremely broad category of communications." 530 U. S., at 723. The majority also tries to disguise its redefinition of content neutrality by characterizing Austin's rule as a "neutral, location-based" restriction. *Ante*, at 6. So too did *Hill* try to conceal its doctrinal innovation by characterizing the buffer-zone law as a neutral "place restriction." 530 U. S., at 723. Finally, the majority finds it immaterial that Austin's rule can be enforced only by "reading a [sign] to determine whether it" contains an off-premises message. *Ante*, at 8. *Hill* likewise found it irrelevant that "the content of the oral statements" would need to "be examined to determine whether" the prohibition applied. 530 U. S., at 720.

The parallel between the majority's opinion and *Hill* should be discomforting given that *Hill* represented "an unprecedented departure" from this Court's First Amendment jurisprudence. *Id.*, at 772 (Kennedy, J., dissenting). Its content-neutrality analysis was, as Justice Scalia explained, "absurd" given that the buffer-zone law was "obviously and undeniably content based." *Id.*, at 742–743 (dissenting opinion). First Amendment scholars from across the ideological spectrum agree. See, *e.g.*, M.

McConnell, Professor Michael W. McConnell's Response, in K. Sullivan, Sex, Money, and Groups: Free Speech and As-sociation Decisions in the October 1999 Term, 28 Pep-perdine L. Rev. 723, 748 (2001) ("The Court said that this statute is content-neutral.  I just literally cannot see how they could possibly come to that conclusion"); Colloquium, *id.*, at 750 (Laurence Tribe stating *Hill* "was slam-dunk simple and slam-dunk wrong"); R. Fallon, Strict Judicial Scrutiny, 54 UCLA L. Rev. 1267, 1298, and n. 174 (2007) (*Hill* "unconvincingly . . . maintain[ed] that a content-based restriction on speech [was] not really content-based").  And, since *Hill*, this Court has all but interred its flawed content-neutrality analysis in both *McCullen*, see *supra*, at 11, and *Reed*.  See *Price* v. *Chicago*, 915 F. 3d 1107, 1118 (CA7 2019) ("In the wake of *McCullen* and *Reed*, it's not too strong to say that what *Hill* explicitly rejected is now prevailing law").

The majority's refusal to acknowledge *Hill* simply under-scores the decision's defunct status.  Again, *Hill* is the only case that could support the majority's ill-conceived content-neutrality analysis, and yet the majority disclaims reliance on it.  Lower courts should take the majority's disclaimer at face value: *Hill* is "a decision that we do not cite." *Ante*, at 13.  And today's decision amounts to little more than an ad hoc exemption for the "location-based" and supposedly "content-agnostic on-/off-premises distinction." *Ibid*.

Even so, the majority's approach should offer little com-fort because arbitrary carveouts from *Reed* undermine the "clear and firm rule governing content neutrality" that we understood to be "an essential means of protecting the free-dom of speech."  576 U. S., at 171.  The majority's deviation from that "clear and firm rule" poses two serious threats to the First Amendment's protections.

First, transforming *Reed*'s clear definition of "content based regulation" back into an opaque and malleable "term

of art" turns the concept of content neutrality into a "ve-hicl[e] for the implementation of individual judges' policy preferences." *Tennessee* v. *Lane*, 541 U. S. 509, 556 (2004) (Scalia, J., dissenting). *Hill* exemplifies this danger. See 530 U. S., at 742 (Scalia, J., dissenting) ("I have no doubt that this regulation would be deemed content based *in an instant* if the case before us involved antiwar protesters, or union members seeking to 'educate' the public about the reasons for their strike"). The majority's approach in this case is cut from the same cloth. As the majority transparently admits, it seeks to "apply [our] precedents to reach the 'commonsense' *result*" and avoid what it perceives as a "bizarre *result*." *Ante*, at 13 (emphasis added). But *Reed* mandates a "commonsense" test for content neutrality even if the *result* is that "laws that might seem entirely reasonable will sometimes be struck down." 576 U. S., at 163, 171 (internal quotation marks omitted).

Second, sanctioning certain content-based classifications but not others ignores that even seemingly reasonable content-based restrictions are ready tools for those who would "suppress disfavored speech." *Id.*, at 167; see also *Hill*, 530 U. S., at 743 (Scalia, J., dissenting) ("'The vice of content-based legislation . . . is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes'"). This is because "the responsibility for distinguishing between" permissible and impermissible content "carries with it the potential for invidious discrimination of disfavored subjects." *Cincinnati* v. *Discovery Network*, *Inc.*, 507 U. S. 410, 423–424, n. 19 (1993). That danger only grows when the content-based distinctions are "by no means clear," giving more leeway for government officials to punish disfavored speakers and ideas. *Ibid.*

The content-based distinction drawn by Austin's off-premises speech restriction is "by no means clear," *ibid.*, and plainly lends itself "to suppress[ing] disfavored

speech," *Reed*, 576 U. S., at 167. As the Court of Appeals noted, Austin's "prepared counsel" "struggled to answer whether" signs conveying messages like "'God Loves You,'" "'Vote for Kathy,'" or "'Sally makes quilts here and sells them at 3200 Main Street'" would be regulated as off-premises signs. 972 F. 3d, at 706. Before us, Austin's counsel had similar difficulties, and *amici* have proposed dozens of religious and political messages that would be next to impossible to categorize under Austin's rule. See, *e.g.*, Brief for Alliance Defending Freedom et. al. as *Amici Curiae* 15–19; Brief for Institute for Justice as *Amicus Curiae* 3–9. These pervasive ambiguities offer enforcement officials ample opportunity to suppress disfavored views. And they underscore *Reed*'s warning that "[i]nnocent motives do not eliminate the danger of censorship presented by a facially content-based statute." 576 U. S., at 167.

\*   \*   \*

Because *Reed* provided a clear and neutral rule that protected the freedom of speech from governmental caprice and viewpoint discrimination, I would adhere to that precedent rather than risk resuscitating *Hill*. I respectfully dissent.