**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0346-24

GARDEN STATE OUTDOOR, LLC,

    Plaintiff-Appellant,

v.

CITY OF SOMERS POINT and
CITY OF SOMERS POINT
ZONING BOARD,

    Defendants-Respondents.

_____

        Argued November 6, 2025 – Decided February 25, 2026

        Before Judges Mayer, Paganelli and Jacobs.

        On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0143-23.

        Justin D. Santagata argued the cause for appellant (Cooper Levenson, attorneys; Justin D. Santagata, on the briefs).

        Thomas G. Smith argued the cause for respondents.

PER CURIAM

This appeal follows an application by plaintiff Garden State Outdoor LLC (Garden State) to defendant City of Somers Point Zoning Board (Board), for variance relief to install an off-premises billboard contrary to the City of Somers Point's (City) zoning ordinance. After the Board denied the application, Garden State filed an action in lieu of prerogative writs seeking to declare the ordinance unconstitutional and vacate the Board's variance denial as arbitrary, capricious, or unreasonable.

Garden State appeals from the trial court's order finding the ordinance constitutional. In addition, Garden State appeals from the trial court's order finding the Board's denial of its application for variance relief was not arbitrary, capricious, or unreasonable, and dismissing its action in lieu of prerogative writs.

Because we conclude the City's ordinance is constitutional and the Board's decision to deny the variance was not arbitrary, capricious, or unreasonable, we affirm. We consider Garden State's constitutional arguments under section I and its variance arguments under section II.

2

I.

A.

In 2010, the City created a subcommittee to review its sign ordinances and regulations. In 2011, the Board engaged Mott Associates, LLC (Mott) "to review . . . recommendations . . . to update and revise its Development Ordinance relative to signs." The Mott report noted the City's "find[ing] that billboards detract from the natural and manmade beauty of the City, and are not allowed as a sign type or an allowed business use within the City." Mott "was to review [a] proposed ordinance and determine if the proposed zoning amendments are consistent with the [City]'s Master Plan[1] Land Use Element and later re-examination reports."

The Mott report noted in accordance with its Master Plan of 1979, the City adopted a Zoning Ordinance to retain, in part, the: "City's predominantly residential character"; "protection of open space and natural resources of the community"; City's "historical features"; and "provision for the safe and

---

[1] "In New Jersey, the master plan is the centerpiece of land use planning. Pursuant to the M[unicipal] L[and] U[se] L[aw (MLUL)], it is 'a composite of one or more written or graphic proposals for the development of the municipality.' [(Quoting)] N.J.S.A. 40:55D-5. It may be adopted by a municipal planning board only after a public hearing, [(citing)] N.J.S.A. 40:55D-28." Nigro v. Plan. Bd. of Saddle River, 122 N.J. 270, 279 (1991).

efficient movement of vehicles and pedestrians."  As to signs, "the City desired not to have off-site commercial signs permitted within the residential zoning districts."  Indeed, "[a]ny signs promoting off-site commercial signage were prohibited due to the fact that it was not desired in the residential neighborhoods."

The Mott report explained the 1998 and 2004 Master Plan Re-examination Reports, "had referenced the goals and specific recommendations to review and revise the sign development regulations."  The Mott report noted the re-examination reports recommended a goal "to 'discourage some of the promotional displays so that they are not continuous and to prohibit other promotional displays which are tacky.'"  Therefore, the Mott report explained, "the City inserted specific language within the land use ordinance to prohibit certain signage, one specific sign, a 'billboard.'"  A billboard was defined as:  "A sign or structure or portion thereof which directs attention to a product, business, service or entertainment conducted, sold or offered elsewhere than upon the lot on which such sign is situated and designed."  (Italicization omitted).  Billboards were prohibited because "the City did not consider these signs to promote the public health, safety or general welfare nor does it promote a desirable visual environment."

4

Further, the Mott report stated specific design considerations include "the number and type of signs, sign locations, sign heights and sign sizes" with size and height being "the most important and stringent requirements." This was deemed necessary "to control the scenic vistas along the roadways within the City and to not clutter the community with undesirable features as to large and intrusive signs."

The Mott report noted the City's goals of "scenic vistas"; avoiding a "strident, hectic atmosphere"; and "open space and natural resources" were not promoted by billboards. Instead, billboards "present visual clutter and provide no natural benefit to the community." Moreover, billboards "take[] away the distinctiveness [and charm] of the [C]ity."

Further, the Mott report cited a 2006 National Highway Traffic Safety Administration report that concluded billboards are distracting and create "a safety hazard" and to the Manual on Uniform Traffic Control Devices that stated billboards were a large distraction and competed with road signage.

The Mott report concluded:

> The proposed sign ordinance . . . clearly defines [that] the purpose, intent and scope is to promote the public health, safety and general welfare . . . . [T]he purpose and intent of this ordinance is not only consistent with the Master Plan of the City but is substantially consistent with all of the re[-]examination

5

A-0346-24

reports. . . . By prohibiting billboards within the [C]ity, it protects the open space and natural resources of the community, retains the community's historic features and provides for the safe and efficient movement of vehicles and pedestrians.

The Board conducted a public hearing regarding the proposed ordinance. The Board considered the Mott report and testimony, and deemed the proposed ordinance consistent with the Master Plan.

In reviewing the proposed ordinance, the City considered the Mott report, as well as other reports, studies, and articles regarding billboards and the impact that billboards have on traffic safety and aesthetics. The City then adopted the ordinance. The ordinance bans the construction of off-site signs, known as "billboards" or "commercial billboards" in Highway Commercial Zoning District two (HC-2).

Under the ordinance, § 114A-3, "billboard" is defined as:

A sign structure and/or sign utilized for: advertising an establishment, an activity, a product or service or entertainment that is sold, produced[,] manufactured, available or furnished; or promoting any activity, including noncommercial activity and solicitation, such as but not limited to charitable solicitation and noncommercial speech, at a place other than on the property on which said sign structure and/or sign is located.

A-0346-24

Garden State challenged the constitutionality of the ordinance by filing a complaint in lieu of prerogative writs against the City and the Board. After hearing oral argument, the trial court found the ordinance was content-neutral and the City's "rationale . . . is unequivocal in that the City determined that billboards have a deleterious effect on both aesthetics and traffic safety." The court noted "[t]his determination was supported by the comprehensive study completed prior to the adoption of the ordinance." Moreover, accepting that rationale, the court concluded, "a city-wide ban is the only available avenue to achieve th[e] goal and . . . [thus,] the ordinance is as narrowly tailored as possible to achieve th[e] goal."

Further, the trial court considered "whether reasonable alternative channels of communication exist to disseminate the information sought to be distributed." In this respect, the court stated:

> A non-exclusive list of alternate channels of communication would include non-billboard on-site signage, internet advertising, direct mail, radio, newspapers, television, circulars and flyers, commercial vehicle signage, public transportation signage, and here at the Jersey Shore, airplane banners as available avenues to commercial enterprisers.

Therefore, the trial court found "that Section 114A of the City['s] . . . ordinance is constitutional."

A-0346-24

B.

On appeal, Garden State argues the trial court erred because the City's ordinance is facially unconstitutional under Bell v. Stafford, 110 N.J. 384 (1988), and even if the City can overcome facial unconstitutionality, the ordinance cannot pass a constitutional challenge as a reasonable time, place, and manner regulation under E & J Equities LLC v. Board of Adjustment of the Township of Franklin, 226 N.J. 549 (2016).

"Where a constitutional challenge is raised, we are required to conduct a de novo review . . . ." Saffos v. Avaya, Inc., 419 N.J. Super. 244, 264 (App. Div. 2011); see also State v. Dalal, 467 N.J. Super. 261, 280 (App. Div. 2021) ("Appellate courts apply a de novo standard when determining the constitutionality of a statute."). We "defer to the trial court's factual findings so long as they are supported by sufficient, credible evidence in the record." Id. at 259-60 (quoting 30 River Ct. E. Urb. Renewal Co. v. Capograsso, 383 N.J. Super. 470, 476 (App. Div. 2006)).

In considering the constitutionality of a government regulation affecting speech, we begin with the First Amendment of the United States Constitution that provides: "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. The New Jersey Constitution, Article I, Paragraph

6 provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. . . ." N.J. Const. art. I, ¶6. "Because our State Constitution's free speech clause is generally interpreted as co-extensive with the First Amendment, federal constitutional principles guide [our] analysis." E & J Equities, 226 N.J. at 568 (quoting Twp. of Pennsauken v. Schad, 160 N.J. 156, 176 (1999)).

Facially Unconstitutional

Garden State contends the trial court erred in concluding the ordinance was not facially unconstitutional because this matter is controlled by Bell. Garden State asserts that "Bell struck down this exact [b]an" and thus the court "need go no further." (Emphasis omitted). We disagree.

In Bell, the New Jersey Supreme Court considered the "first amendment and freedom of speech concerns" that arose from the "enactment and enforcement of an ordinance declaring that '[b]illboards, signboards, and off-premises advertising signs and devices [we]re prohibited within any zoning district of the Township.'" 110 N.J. at 387 (first alteration in original).

The Court stated when "an enactment directly impinges on a constitutionally protected right . . . [c]ourts are far more demanding of clarity,

specificity and restrictiveness with respect to legislative enactments that have a demonstrable impact on fundamental rights." Id. at 395. Therefore, when "an ordinance infringes on a fundamental right, 'the burden is upon the municipality to articulate the objectives of [the] . . . ordinance.'" Ibid. (alteration in original) (quoting Zilinsky v. Zoning Bd. of Adjustment of Verona, 105 N.J. 363, 371 (1987)). Further, "[t]he municipality must satisfactorily demonstrate a legitimate governmental interest that is to be served by the enactment and demonstrate a reasonable factual basis indicating that the regulation advances the governmental interest and is no more expansive than necessary in advancing that interest." Ibid.

In considering the record, the Court determined "[t]he ordinance fail[ed] to reveal either its particular governmental objectives or its factual underpinnings." Id. at 396. Instead, "the record [wa]s almost completely devoid of any evidence concerning what interests . . . [we]re served by the ordinance and the extent to which the ordinance ha[d] advanced those interests." Ibid. The Court contemplated that "preserving aesthetics" and "promoting traffic safety" could be legitimate interests. Ibid. However, even assuming the presence of those interests, "there ha[d] been no demonstration of the factual basis for . . . a total municipal-wide ban." Ibid. The Court stated "[t]his clearly implicate[d]

10

an important prong in the test of constitutional validity:  that this ordinance constituted the least restrictive means possible by which to serve such an interest."  Id. at 396-97.

In addition, the Court stated "there ha[d] been no adequate showing that the ordinance left open alternative means of communication with the audience that was reached by the medium that [wa]s prohibited by the ordinance," id. at 397; there is a "burden of showing that there were reasonably equivalent forms of communication available."  Ibid.

Therefore, the Court "was constrained to declare [the ordinance] facially unconstitutional" because there was a "failure to justify the passage of such a broad and encompassing ordinance that substantially curtail[ed] freedom of speech and expression."  Id. at 398.

Nevertheless, the Court noted:

> This does not mean that [a governmental entity] is incapacitated from enacting an ordinance seeking to further a proper governmental objective and suitably restricted to meet that objective and satisfy the constitutional imperatives . . . in light of the problems pecul[i]ar to that municipality.  Our only determination here is that the ordinance in question facially infringes on a fundamental right without sufficient support in the record to justify its validity.
>
> [Ibid.]

11

Therefore, <u>Bell</u> stands for the proposition that a government ban on billboards, that is not supported by actual interests that are tethered to the ban, and fails to offer alternative means of communication, will not facially withstand constitutional scrutiny. <u>Bell</u> does not sweep as broadly as Garden State suggests, that is, to nullify all billboard prohibitions. Indeed, <u>Bell</u> held the opposite, when there is "a proper governmental objective and [regulation] suitably restricted to meet that objective" are present. <u>Ibid.</u>

Here, applying <u>Bell</u>, we conclude the City's ordinance is not facially unconstitutional. First, there is no factual dispute regarding the City's historic and substantial interest in protecting its aesthetics and traffic safety. The City's interest is stated in its Master Plan and subsequent re-examination reports. Moreover, the ordinance prohibiting off-premises billboards is reasonably suited to achieve the goal of maintaining aesthetics and traffic safety while allowing for alternative means of communication.

<u>Time, Place, and Manner</u>

Garden State contends the City's billboard ban fails the <u>Clark</u>/<u>Ward</u> time, place, and manner test. Garden State acknowledges the ordinance is content neutral. Further, Garden State recognizes "'safety' can be a substantial interest," however, "saying 'safety' is not enough" and the record supporting the 2011

12

ordinance is "overcome" by "the more recent and competent evidence presented by Garden State." Garden State notes "[t]here was no evidence or testimony to the contrary before the Board" and a "plenary hearing was necessary," presumably before the trial court. In addition, while Garden State concedes that "aesthetics are a substantial interest," it argues the ordinance was not narrowly tailored to address that interest. Moreover, Garden State argues the ordinance "leaves no reasonably equivalent alternative means of communication to a billboard."

In E & J Equities, the New Jersey Supreme Court considered an "ordinance that permit[ted] billboards, subject to multiple conditions, in a zoning district proximate to an interstate highway but expressly prohibit[ted] digital billboards anywhere in the municipality." 226 N.J. at 556.

The Court noted:

> Billboards of any kind are subject to considerable regulation. Regulations on billboards are justified because "signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs[.]"
>
> [Id. at 567 (alteration in original) (quoting City of Ladue v. Gilleo, 512 U.S. 43, 48 (1994)).]

13

The Court "conclude[d] that an ordinance or statute regulating signs, including billboards of any form, and affecting commercial as well as noncommercial speech should be examined in accordance with the Clark/Ward[2] time, place, and manner standard." Id. at 580. Under that standard, the government, "must demonstrate that the prohibition . . . is content neutral, that it is narrowly tailored to serve a recognized and identified government interest, and that reasonable alternative channels of communication exist to disseminate the information sought to be distributed." Id. at 582 (citing Ward, 491 U.S. at 791; Clark, 468 U.S. at 293).

The Court explained, to determine "whether an ordinance is narrowly tailored, the inquiry is whether it 'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Ibid. (quoting Ward, 491 U.S. at 799). Further, "[a] restriction on speech may not substantially burden more speech than necessary to further the government interest, but identification of another alternative that might be less restrictive of speech to achieve the desired end does not render the ordinance invalid." Ibid. (citing Ward, 491 U.S. at 798-99). The Court "recognize[d] that the Township was not

---

[2] Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288 (1984); Ward v. Rock Against Racism, 491 U.S. 781 (1989).

14

required to adopt the least restrictive means to further its interests."  Id. at 584;
see Ward, 491 U.S. at 798 ("Lest any confusion on the point remain, we reaffirm
today that a regulation of the time, place, or manner of protected speech must
be narrowly tailored to serve the government's legitimate, content-neutral
interests but that it need not be the least restrictive or least intrusive means of
doing so.").

The Court stated, "there c[ould] be little, if any, debate that the
[o]rdinance [wa]s content neutral." E & J Equities, 226 N.J. at 583.  Indeed, the
Court stated the "ban of digital billboards addresse[d] a manner of
communication, not its content."  Ibid.  "[H]owever, in the face of a record
founded only on unsupported suppositions, fears, and concerns," the Court did
not "address whether the course taken by the governing body [wa]s reasonable
under all of the circumstances."  Id. at 585.

Further, the Court "acknowledge[d] that aesthetics and public safety are
generally considered to be substantial governmental interests particularly in the
context of regulations affecting billboards."  Id. at 556.  Nevertheless, "simply
invoking aesthetics and public safety to ban a type of sign, without more, does
not carry the day."  Id. at 557.  Instead, "the record must support, to some degree,
the interests that the municipality seeks to protect or advance," ibid., and "there

A-0346-24

must be a modicum of support for the invoked government interest." Id. at 583. In this respect, the Court concluded the record was "founded only on unsupported suppositions, fears, and concerns." Id. at 585. It stated "a governing body . . . cannot simply invoke those interests with scant factual support informing its decision-making and expect to withstand a constitutional challenge." Ibid.

As it did in Bell, the Court noted the township was not precluded from adopting a regulation. It stated:

> We do not suggest that no municipal restriction on off-premises digital billboards or multiple message centers can pass constitutional muster. . . . [W]e do not consider the ban adopted by the [t]ownship a complete ban on a form of communication but rather a restriction on a subset of off-premises signage. A more robust factual record in support of the cited government interests deemed substantial may satisfy the Clark/Ward standard.

> [Ibid.]

Here, the parties agree that the City's ordinance is content neutral. We see no basis to disagree with their positions. Nevertheless, we add that in City of Austin v. Reagan National Advertising of Austin, LLC, the United States Supreme Court stated "thousands of jurisdictions around the country . . . regulate[] signs that advertise things that are not located on the same premises

16

as the sign, as well as signs that direct people to offsite locations.  These are known as off-premises signs, and they include, most notably, billboards."  596 U.S. 61, 64 (2022).

In City of Austin, "the [c]ity's sign code defined the term 'off-premise sign' to mean 'a sign advertising a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that directs persons to any location not on that site.'"  Id. at 66.  The Court held "the . . . off-premises distinction requires an examination of speech only in service of drawing neutral, location-based lines.  It is agnostic as to content.  Thus, absent a content-based purpose or justification, the City's distinction is content neutral and does not warrant the application of strict scrutiny."  Id. at 69.

The Court explained:

> [E]nforcing the . . . challenged sign code provisions requires reading a billboard to determine whether it directs readers to the property on which it stands or to some other, offsite location. . . . [T]he City's provisions at issue here do not single out any topic or subject matter for differential treatment.  A sign's substantive message itself is irrelevant to the application of the provisions; there are no content-discriminatory classifications for political messages, ideological messages, or directional messages concerning specific events, including those sponsored by religious and nonprofit organizations.  Rather, the . . . provisions distinguish based on location:  A given sign is treated differently based solely on whether it is located on the

17

> same premises as the thing being discussed or not. The message on the sign matters only to the extent that it informs the sign's relative location. The on-/off-premises distinction is therefore similar to ordinary time, place, or manner restrictions.
>
> [Id. at 71.]

Here, we similarly conclude the City's ordinance is content neutral. However, that conclusion "does not end the First Amendment inquiry." Id. at 76.

Under Clark/Ward, we next consider whether the ordinance "is narrowly tailored to serve a recognized and identified government interest." E & J Equities, 226 N.J. at 582. See also City of Austin, 596 U.S. at 76. In this respect, we do not disturb the trial court's factual finding, amply supported in the record, that the City had a substantial interest in aesthetics and traffic safety. The City memorialized these interests in its Master Plan and subsequent re-examination reports. Moreover, its ordinance was adopted after a detailed and comprehensive study regarding a billboard's impact on those interests.

Garden State's arguments regarding the evidence before the Board, to support the safety aspects of the ordinance, and the need for a plenary hearing are misplaced. The Board was not tasked with considering a constitutional challenge to the ordinance. Indeed, "[i]t is not the function of the board of

adjustment or the planning board to decide constitutional questions . . . ." Messer v. Burlington Twp., 172 N.J. Super. 479, 487 (Law Div. 1980); see also N.J.S.A. 40:55D-25 (delineating the express powers a planning board may exercise). Moreover, although here Garden State suggests a plenary hearing was necessary before the trial court, Garden State took the position that "there[ wa]s no need for a [p]lenary [h]earing." Further, we conclude the City's prohibition of off-premises billboards is narrowly tailored to address its interests in aesthetics and traffic safety.

Lastly, under Clark/Ward, we consider whether "reasonable alternative channels of communication exist to disseminate the information sought to be distributed." E & J Equities, 226 N.J. at 582. The requirement cannot be satisfied by requiring the City to establish the banned speech can be exactly replicated by an alternative channel of communication. To hold the City to that standard would undermine any regulation. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. Int'l Soc'y for Krishna Consciousness, 452 U.S. 640, 647 (1981). Instead, restrictions must "leave open ample alternative channels for communication of the information." Clark, 468 U.S. at

19

293. By applying this standard, we conclude the City satisfied the "reasonable alternative" factor under Clark/Ward.

Here, applying Clark/Ward, we conclude the City's ordinance satisfies the time, place, and manner test.

II.

Garden State contends that if the ordinance is declared unconstitutional, its application would only be subject to the remaining valid portions of the City's sign regulations. Based on our foregoing constitutional analysis, we reject this contention without further comment.

Next, we consider Garden State's argument that the Board's denial of its application was arbitrary, capricious, or unreasonable. In its memorializing resolution, the Board stated Garden State applied "to request a waiver of site plan approval, a 'c' variance and two 'd' variances for the construction of a double-sided digital advertising sign and support column."[3] The Board stated Garden State intended to erect the billboard under a lease for real property located in the City.

In its memorializing resolution, the Board stated it: (1) received Garden State's application, a billboard location plan, and other documents in support of

---

[3] N.J.S.A. 40:55D-70(c) and N.J.S.A. 40:55D-70(d).

A-0346-24

the application; (2) received an aerial photograph of the property, a photograph of the proposed billboard signage, and "rendered photographs of each side of the proposed billboard sign"; (3) heard from Garden State's counsel; (4) heard testimony from Jason T. Sciullo, a qualified New Jersey licensed professional engineer and planner, and Adam Burkett, one of the principals of Garden State; (5) heard from two members of the public; and (6) received the report of Board Engineer, Matthew F. Doran, and incorporated it into the resolution.

In addition, the Board's resolution stated its "findings and conclusions" which, it noted, are reflected in the record. The Board noted "[t]he [p]roperty is located in the . . . HC-2 . . . , which allows primarily for highway commercial uses." However, "[b]illboards are not permitted in the HC-2 . . . ."

The resolution notes counsel provided an introduction to the application. Counsel explained "the size, location and operation of the proposed sign. He noted that the sign would essentially be facing the commercial district, will advertise both businesses and community events, and is not a moving billboard." Further, counsel "pointed out that the New Jersey Department of Transportation ("NJDOT") had approved the size of the proposed billboard up to 670 s[quare] f[eet]" and Garden State "is only seeking a sign of 378 s[quare] f[eet]." In

21

addition, "animation will [not] appear on the proposed sign" and "the proposed billboard meets the national standards for brightness."

The resolution noted that Sciullo is a licensed engineer and planner. The Board accepted Sciullo as a qualified expert for the hearing. Further, the resolution stated "Sciullo described the location of the proposed billboard" and presented "a map showing the proposed . . . location." In addition, Sciullo "described the stone-faced pillar that w[ould] hold up the billboard." Sciullo indicated that the billboard "would have height of 45[ feet] and is a proposed double-sided digital sign measuring 10.5[ feet] X 36[ feet], for a total sign area of 378 [square feet]." He "reiterated . . . the proposed billboard sign could be used for community-based messaging such as amber alerts, which could constitute a tremendous benefit to the community."

The resolution detailed Sciullo's testimony regarding whether the proposed billboard would cause a distraction. Sciullo stated the NJDOT "found the proposed location acceptable for up to 670 [square feet] of billboard . . . therefore, the proposed signage of 378 [square feet] was appropriate in size" and a Federal Highway Administration study "on the effects of billboard signage on driver distraction found that billboards are not a cause of driver distraction." Moreover, Sciullo stated the proposed billboard would "look similar to most

22

other signs in Somers Point" and would "not be visible from Somers Mansion property or from any residential areas."  Sciullo noted the billboard would "automatically dim at night."

As to "positive criteria," Sciulli stated "the application advances several purposes of zoning under the MLUL, including promoting the general welfare" by "providing messages for community-based events," an "appropriate location for a variety of uses, and encouraging the coordination of various public and private activities shaping land development."

Further, Sciulli testified the application achieved the goals of the Master Plan because the billboard would "support existing businesses."  Sciulli noted the "proposed billboard . . . would not be a detriment to the public good."

As to the "c(2)" front yard setback variance, Sciulli relied on the same reasoning to support the "(d)" variances.  He noted the "[p]roperty is particularly well suited for the proposed billboard and the general welfare will be served by" the billboard.

The resolution also detailed that Board members' inquired about the billboard's "proximity to the historic Somers Mansion Property" and the percentage of local advertisers that would use the billboard.  As to the latter,

23

Burkett advised that Garden State has an advertising sales force and "[a]n actual percentage was not" available.

Two members of the public spoke during the public portion of the hearing. One inquired about whether the billboard would extend over the roadway and was advised it would not. The other individual, Garden State's intended landlord, stated "all local businesses . . . would be allowed to advertise on the billboard." Doran did not testify during the hearing but instead relied on his report.

According to the Board's resolution, the members voted seven to zero to deny the application. In the resolution, the Board stated it found:

> [T]he application was not consistent with the City's Zoning Ordinance or Master Plan, that [Garden State] failed to prove special reasons to support the granting of the required "d" variances, and had not adequately presented a case and had not met its burden for the Board to grant site plan waiver and the "c" and "d" variance relief . . . under the requirements of the MLUL. In addition, the Board made the following additional findings of fact and conclusions of law, and decision:
>
> A. The Board finds that pursuant to N.J.S.A. 40:55D-70(d)(1), d(6) and c(2), the purposes of the [MLUL] would not be advanced by deviations or departures from the requirements of the Zoning Ordinance and that the benefits of the requested variances will not substantially outweigh the detriments. Further, the Board finds that the requested

variance relief will cause substantial detriment to the public good and will substantially impair the intent and the purpose of the zone plan of the City . . . and the Zoning Ordinance.

B. In terms of negative criteria (that granting the variances will not cause substantial detriment to the public good or substantially impair the intent and purpose of the City . . . zone plan or Zoning Ordinance), the Board finds that the [billboard] will have substantial negative impacts and will cause substantial detriments to the public good, and that the overall benefits from granting the requested variances will be substantially outweighed by the detriments.

For these reasons, the Board finds that the variance relief is not warranted and should be denied. The Board finds that in reaching its decision, it has considered [Garden State]'s entire proposal rather than only the detriments from the [proposed billboard] and each requested deviation.

The trial court stated it carefully reviewed the transcript of the Board's hearing and found the Board gave "reflective and mindful consideration of [Garden State']s application." The court found the "Board members were provided with copies of the application and plans submitted" by Garden State. Moreover, the Board was provided with Doran's report which "was considered and incorporated into the record."

In addition, the trial court found the Board received the testimony of Sciullo on behalf of Garden State. The court noted "Sciullo testified as to the

nature of the application and set forth his opinion that [Garden State] had evidenced special reasons for the granting of the ["d"] variances and had satisfied both the positive and negative criteria." The court noted "[t]he Board was free to accept or reject, all or a portion of, [Sciullo's] testimony."

The trial court found "[t]he record is clear that the . . . Board rejected [Garden State]'s expert's testimony and did not find that [Garden State] had evidenced special reasons (purpose of zoning) for the granting of the ["d"] variances." Moreover, the court found "the record is replete with findings . . . incorporated into the memorializing resolution, that the proposed development could not be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the zoning plan and zoning ordinance."

The court stated:

> After a complete review of the record, including a transcript of the hearing before the . . . Board, [Garden State]'s submissions, the Board's engineer/planners report, the Board's findings of fact set forth on the record and the memorializing [r]esolution . . . th[e c]ourt f[ound] that the decision of the . . . Board was more than fully supported by the record and the decision to deny the application was not arbitrary, capricious[,] and unreasonable.

Garden State argues the trial court erred in upholding the Board's decision because the Board's conclusory resolution fails to set forth a factual basis for the denial. Instead, Garden State contends it "established that the Property is best suited for the billboard and that its location will mitigate the purported negative effects normally associated with a billboard."

Garden State argues the "sole cited reason for denial of the [a]pplication"—the effect on "Somers Point Mansion"—is not explained in the resolution. Moreover, it contends there was "unrebutted testimony . . . that the billboard on this [p]roperty would be at the most advantageous angle to ameliorate any supposed effect." In addition, Garden State argues the Board fails to explain the same effect from "other signs" in the same zone.

Further, Garden State contends the Board's reliance on the effect on Somers Point Mansion is misplaced because the mansion is located in another zone. Garden State argues "[i]t is well-settled that a local land use board may not apply neighboring zoning purposes to the zone for which a use variance is sought." Further, the Somers Point Mansion is in a zone to protect historic properties and there is nothing historic about the zone in which it sought the variance, and the property of the intended billboard is "separated from the Somers Point Mansion by a four-lane thoroughfare."

27

Garden State argues it "satisfied the negative criteria by 'enhanced quality of proof' because the surrounding uses and signs establish reconciliation with the zoning." Further, it contends "[d]igital billboards now allow dimming and other technological features to address the purported 'problems' of static billboards" and "'safety' concerns . . . were rejected in E & J Equities" and by the "unrebutted testimony by [its] planner."

Moreover, Garden State asserts "[t]here are two forms of height variances, a '(d)(6)' heigh[t] variance where the height 'exceeds 10 feet or 10% [of] the maximum height permitted,' or a bulk variance for height where the deviation is less than that."

Garden State contends it "could prove special reasons for a height variance" because: (1) "the billboard was no higher than it needed to be to serve its purpose"; (2) the billboard "was consistent with, or only slightly higher than, permitted signage in the 'HC-2 Zone'"; and (3) "the technology of a digital billboard was able to ameliorate purported negative effects of a billboard." Further, for the same reasons, it "was entitled to a bulk variance for principal front set[]back, which was only necessitated because the sign itself exceeds the principal front set[]back requirement; the portion on the ground."

A-0346-24

Lastly, Garden State contends "[t]he Board's resolution contains contradictory and passing references to a 'use variance' for two principal uses." It states the trial court "did not address this in its dismissal." Nevertheless, it argues "the one-principal-use issue does not matter because a billboard is not a principal use under the [City] Code."

"Our standard of review for the grant or denial of a variance is the same as that applied by the Law Division." Advance at Branchburg II, LLC v. Branchburg Twp. Bd. of Adjustment, 433 N.J. Super. 247, 252 (App. Div. 2013) (citing Bressman v. Gash, 131 N.J. 517, 529 (1993)). "The role of a court reviewing a decision by a board of adjustment is strictly circumscribed[.]" N.Y. SMSA Ltd. P'ship v. Bd. of Adjustment of Bernards, 324 N.J. Super. 149, 164 (App. Div. 1999). "[B]ecause of their peculiar knowledge of local conditions," local boards are "allowed wide latitude in the exercise of their delegated discretion." Booth v. Bd. of Adjustment of Rockaway Twp., 50 N.J. 302, 306 (1967). A board's actions are thus presumed valid, and "the party attacking such action has the burden of proving otherwise." N.Y. SMSA Ltd. P'ship, 324 N.J. Super. at 163.

"It is well-settled that a decision of a zoning board may be set aside only when it is 'arbitrary, capricious or unreasonable.'" Cell S. of N.J. v. Zoning Bd.

29

of Adjustment, 172 N.J. 75, 81 (2002) (quoting Medici v. BPR Co., 107 N.J. 1, 15 (1987)). "[A]rbitrariness or unreasonableness . . . have been interpreted to mean 'willful and unreasoning action, without consideration and in disregard of circumstances.'" Seaview Harbor Realignment Comm., LLC v. Twp. Comm., of Egg Harbor, 470 N.J. Super. 71, 94 (App. Div. 2021) (quoting D'Anastasio Corp. v. Twp. of Pilesgrove, 387 N.J. Super. 247, 251 (Law Div. 2005)).

A "[b]oard's factual conclusions are entitled to great weight and . . . ought not be disturbed unless there is insufficient evidence to support them." Rowatti v. Gonchar, 101 N.J. 46, 52 (1985). However, "[w]e are ordinarily not bound by an agency's determination on a question of law[.]" Advance at Branchburg, 433 N.J. Super. at 252 (citing In re Distrib. of Liquid Assets, 168 N.J. 1, 11 (2001)). Further, "a municipal board's construction of its own ordinances is reviewed de novo." Ibid. We "[n]evertheless, . . . 'recognize the board's knowledge of local circumstances and accord deference to its interpretation.'" Id. at 252 (quoting Fallon Prop., LLC v. Bethlehem Twp. Planning Bd., 369 N.J. Super. 552, 562 (App. Div. 2004)).

"Where there is room for two opinions, action is [valid] when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached." Worthington v. Fauver, 88 N.J. 183,

204-05 (1982) (alteration in original) (quoting Bayshore Sewerage Co. v. Dep't Env't Prot., 122 N.J. Super. 184, 189 (Ch. Div. 1973)). Therefore, "[t]he court will not substitute its judgment for that of the board, and the board's action will be set aside only if the court finds a clear abuse of discretion." N.Y. SMSA Ltd. P'Ship, 324 N.J. Super. at 164.

Under N.J.S.A. 40:55D-70(d)(1), the Board has the power to "[i]n particular cases for special reasons, grant a variance to allow departure from regulations . . . to permit[] a use . . . in a district restricted against such use . . . ." However,

> [n]o variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.
>
> [Ibid.]

"The statute requires proof of both positive and negative criteria." Sica v. Bd. of Adjustment of Wall, 127 N.J. 152, 156 (1992). As to "positive criteria, the applicant must establish 'special reasons' for the grant of the variance." Ibid. "The negative criteria require proof that the variance 'can be granted without

31

substantial detriment to the public good' and that it 'will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.'" Ibid.

In determining whether a board properly exercised its discretion, "[c]ourts give greater deference to variance denials than to grants of variances, since variances tend to impair sound zoning." Med. Ctr. at Princeton v. Twp. of Princeton Zoning Bd. of Adjustment, 343 N.J. Super. 177, 199 (App. Div. 2001). "Where a board of adjustment has denied a variance, the plaintiff has the heavy burden of proving that the evidence presented to the board was so overwhelmingly in favor of the applicant that the board's action can be said to be arbitrary, capricious or unreasonable." Med. Realty Assocs. v. Bd. of Adjustment of Summit, 228 N.J. Super. 226, 233 (App. Div. 1988).

Under N.J.S.A. 40:55D-10(g)(2), the Board is required to pass a resolution and "include findings of fact and conclusions based thereon in each decision on any application for development and shall reduce the decision to writing." "It is the resolution, and not [the] board members' deliberations, that provides the statutorily required findings of fact and conclusions." N.Y. SMSA, L.P. v. Bd. of Adjustment of Weehawken, 370 N.J. Super. 319, 334 (App. Div. 2004).

"Zoning boards may choose which witnesses, including expert witnesses, to believe." Bd. of Educ. of Clifton v. Zoning Bd. of Adjustment of Clifton, 409

32

N.J. Super. 389, 434 (App. Div. 2009). "However, to be binding on appeal, that choice must be reasonably made." Ibid. "In addition, the choice must be explained" and "[t]he board cannot rely upon unsubstantiated allegations." Id. at 434-35.

Applying these well-established principles, we conclude Garden State failed to establish the Board's denial was arbitrary, capricious, or unreasonable. The Board's resolution clearly states its conclusion that Garden State failed to establish the positive and negative criteria. The Board's decision is adequately supported by the factual record. We will not substitute our judgment for the Board's. Moreover, Garden State has not provided "overwhelming" evidence to convince us that the Board's denial was arbitrary, capricious, or unreasonable. See Med. Realty Assocs., 228 N.J. Super. at 233.

To the extent we have not addressed any other arguments raised by Garden State, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0346-24